## IN THE UNITED STATES DISTRICT COURT FOR
## THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| CHARTWELL STUDIO, INC. | ) | |
| | ) | |
| Plaintiff, | ) | Case No.: 1:19-cv-06944 |
| | ) | |
| v. | ) | |
| | ) | |
| TEAM IMPRESSIONS, INC. | ) | |
| THE PEEL PEOPLE, LLC | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFF'S COMPLAINT

Plaintiff CHARTWELL STUDIO, INC. ("Chartwell"), by and through its attorneys, Duggan Bertsch, LLC, hereby complains of Defendants, TEAM IMPRESSIONS, INC. ("Team Impressions"), and THE PEEL PEOPLE, LLC, ("Peel People"), as follows:

## NATURE OF CASE AND RELIEF SOUGHT

1.      This action involves a dispute over the design, manufacture, marketing, sales, and distribution of certain removable, self-adhesive stickers and decals produced by the Plaintiff (the "Chartwell Products"), and misappropriated by the Defendants.

2.      For virtually its entire existence, beginning in 2002, Chartwell utilized Team Impressions, a manufacturer, to print and package Chartwell Products, principally stickers and decals, which Chartwell then sold to some of the largest discount retailers in the United States, including Dollar Tree Stores, Inc. ("Dollar Tree"). This symbiotic relationship continued uninterrupted until early 2018 when, following unsuccessful price negotiations between Chartwell and Team Impressions, Chartwell was forced to seek an alternative manufacturer for its stickers and decals being supplied to Dollar Tree.

3.      Following termination of this manufacturing relationship, Chartwell came to realize that Team Impressions was not just a printer/manufacturer, but had, in conjunction with Peel People, contrived a sales and marketing plan to steal Chartwell's products and designs and interfered directly with one of its most significant customers, Dollar Tree.

4.      Team Impressions was not "just a manufacturer" as it had repeatedly represented to Chartwell.  Team Impressions, in conjunction with its affiliate, Peel People, began competing with Chartwell directly in marketing, sale and distribution of products derived entirely from the copying of Chartwell Products ("Defendant Products"), all in an unlawful manner.

5.      Vertically integrating, and venturing into a new line of business to fairly compete with Chartwell would be one thing, but the actions undertaken by Defendants were particularly egregious – they stole Chartwell's work, and then sold it to Chartwell's customer, Dollar Tree.

6.      One need only look at the vast array of products from both parties, side-by-side, to grasp the overwhelming evidence that Defendants engaged in a scheme of wrongful conduct that has culminated in the willful misappropriation of what is the very essence of Chartwell Products and business.

7.       Components of Chartwell Products were reproduced by Defendants as exact, or near exact copies of Chartwell Products. A set of photographs depicting side-by-side images of Chartwell Products and Defendant Products is attached hereto as <u>Exhibit 1</u>.[1]

8.      The copying of the decals and stickers is problematic in its own right, but Defendants were even more brazen in their campaign to copy Chartwell and steal its work.  Even the packaging was identical or nearly identical, utilizing similar designs, color schemes, and text

---

[1] Chartwell will present physical copies of all products to the Court, as needed, in order to further demonstrate the overall similarities between the products, as detailed herein.

in order to deceive consumers and capitalize upon the confusing similarity between the products, in a clear case of trade dress infringement.

9.     This conduct became so brazen that Defendant Products began to be sold in displays at Dollar Tree stores - displays that were purchased by Chartwell, designed by Chartwell, and supplied to thousands of Dollar Tree stores for the purpose of displaying, marketing, and selling Chartwell Products.  See photographs depicting sale displays, attached hereto as Exhibit 2.

10.     Defendants' wrongful conduct even goes beyond what can be easily discerned by the average consumer of these types of products. Defendants also had access to, and used Chartwell's trade secrets in the development and sale of the Defendant Products, including misappropriation of Chartwell's proprietary technical specifications, productions files, and pricing model, all of which had been developed over time, and which Defendants knew and acknowledged was confidential, all so that it could undercut Chartwell with Dollar Tree.

11.     Defendants' glaring bad faith is undeniable.  They knew that Chartwell ran a successful business, and over a period of time, engaged in methodical and deliberate actions intended to capitalize on the same market, and they did so by copying virtually every critical aspect of Chartwell's business, top to bottom.

12.     As detailed in this Complaint, Defendants caused Chartwell in 2019 to lose significant sales volume and diminished margins with its customer Dollar Tree,  while Defendants directly benefited. Comparing 2018 to 2019, for the eight-month fiscal period ending August 31, 2019, Chartwell unit volumes with Dollar Tree dropped twenty-six percent (26%).  Additionally, as a direct result of Defendants' interference with Dollar Tree, beginning in the fourth quarter of 2018 and through 2019, in order to retain business and competing against its own copied products, Chartwell was forced to suffer price concessions with Dollar Tree. Those concessions to date have

3

accumulated to $480,000 and damages continue to mount as Chartwell's sales are continuing to suffer.

13. This illegal conduct has caused Chartwell material economic harm both in volume of sales and sale price, and if not enjoined, will continue to cause significant irreparable harm to Chartwell, depleting its sales to Dollar Tree, other retailers and consumers alike, while also causing serious harm to its reputation and goodwill as well as critical loss of its identity among consumers.

## THE PARTIES

14. Plaintiff Chartwell is an Illinois corporation with its principal place of business at 320 W. Ohio Street, Suite 3W, Chicago, Illinois 60654.

15. Defendant Team Impressions is an Illinois corporation with its principal place of business at 360 Scott Street, Elk Grove Village, Illinois 60007.

16. Defendant Peel People is a Delaware corporation with its principal place of business at 360 Scott Street, Elk Grove Village, Illinois 60007, the same address as Team Impressions.

17. Upon information and belief, Team Impressions merged with, purchased, or otherwise became affiliated with Peel People, or at minimum, is sharing employees, and critical business information, including that which has been misappropriated from Chartwell.

## JURISDICTION AND VENUE

18. This court has original subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1121, 18 U.S.C. § 1331, and 18 USC § 1338, and has supplemental jurisdiction pursuant to 28 U.S.C. 1367(a).

19.     This court has personal jurisdiction over Defendant Team Impressions because Team Impressions is an Illinois Corporation with its principal place of business at 360 Scott Street, Elk Grove Village, Illinois 60007.

20.     This court has personal jurisdiction over Defendant Peel People because Peel People has its principal place of business at 360 Scott Street, Elk Grove Village, Illinois 60007.

21.     This court also has personal jurisdiction over this matter because this suit arises out of actions that occurred in the State of Illinois.

22.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because all, or a substantial part of the actions and transactions at issue occurred within the Northern District of Illinois.

## FACTS COMMON TO ALL COUNTS

### Background

23.     Chartwell is a privately owned, Chicago-based, boutique design group specializing in the design, development and production of fashionable and artful crafts, personal accessories and home décor consumer goods, including wall decals, adhesive stickers, and other similar products, which are distributed and sold through décor and craft departments of leading discount retailers throughout North America.

24.     Chartwell has over fifteen (15) years of experience in the design, printing, and craft industry. Chartwell prides itself as being responsive to the design sensibilities of the consumer, while also protecting the margins of its retail partners.

25.     Chartwell-owned brands include Wall Wear Removable Stickers®, Main Street Wall Creations ®, and Scamper Studio® (the "Chartwell Brands"):

 



26.    Chartwell owns federal registrations for the foregoing trademarks. See U.S. Trademark Registration Nos. 3241695, 3665050, and 4555117. Chartwell considers its intellectual property as a key component and valuable asset to its core business, and ability to compete and stay in business.

27.    Team Impressions is a Chicago-area based manufacturer of in-line printed products, and as presented on its website, are "specialists in pressure sensitive papers, films, and foils, with 30 years serving companies that supply the craft, scrapbooking, home décor, automotive, education, and children's activity book trade."

28.    As advertised, Team Impressions was merely a manufacturer, with no history of, or future intention to engage in business in other areas of the distribution chain - a fact it adamantly reiterated to Chartwell on numerous occasions.

29.    Peel People's business started in 2013, well after Chartwell, and focuses on the same markets as Chartwell. On its website, Peel People represents itself as, "a leading manufacturer of peel & stick products - designed, printed and sold in the United States. We

proudly supply the nation's top retailers with stickers, decals, gift tags, classroom items and wall décor." Peel People's products are sold under the name "DIY Décor":



30.     Peel People does not have any registrations for DIY Décor.

31.     Peel People also sells products under a generic "Peel and Stick" product header. See Exhibit 1 and Exhibit 2.

<u>Chartwell - Team Impressions Relationship</u>

32.     From 2004 to 2018, Chartwell contracted with Team Impressions to print and package its highly successful line of printed products, including peel-and-stick wall décor decals, window decals, alphabet poster decals, automotive decals, and other printed products, which Chartwell then sold to its retail customers, Walmart and Dollar Tree.

33.     Specifically, Team Impressions produced the Chartwell Products, including reproduction of proprietary drawings, artwork, packaging, and stylistic designs to Chartwell's exact required specifications.

34.     The contractual terms between Chartwell and Team Impressions were memorialized, in part, by manufacturing pricing agreements and purchase orders, and the course of conduct and terms of engagement that had been applicable throughout, and established during the duration of their business relationship.

35.     The terms and conditions of the Chartwell/Team Impressions relationship included specifications related to printing practices, proprietary compositions of paper backing, substrate

and film and foil materials vital to the print process, folding techniques, glue and adhesive formulas, and all other technical specifications for the Chartwell Products, as well as payment terms and pricing. An example of purchase orders issued for printing services is attached hereto as Exhibit 3.

36.     During the course of its relationship with Team Impressions, and continuing to this day, Chartwell sold the Chartwell Products to large retailers, including Dollar Tree. Dollar Tree operates a chain of variety discount stores that sells items for one dollar or less, with approximately 15,000 stores throughout the U.S. and Canada.

37.     Chartwell's approximate unit sales to Dollar Tree, for the last several years were as follows:[2]

| Year | Unit Sales |
|------|-----------|
| 2019 YTD August | 5,908,000 |
| 2018 Full Year | 11,985,000 |
| 2017 Full Year | 10,265,000 |

38.     Over a fifteen (15) year relationship, Chartwell has sold Dollar Tree more than 50 million stickers and wall decals. The basis for maintaining this long-lasting relationship rested: (1) in Chartwell's innovative, fashion-trending, ever-changing, and consistently updated artful renderings prepared by its own design group; and (2) with the proprietary, technical specifications of printing materials and adhesive formulas developed over many years by Chartwell that provided unique performance attributes. Defendants had knowledge of these proprietary advantages, which they used to their advantage.

---

[2] Chartwell will provide pricing to the Court, as needed, to show damages, but its pricing is confidential, as alleged as part of this Complaint.

39.     Throughout its long-term retail customer relationships, Chartwell spent considerable time and expense to continuously update and revise its peel-and-stick decal programs to include enhancements to proprietary artwork, materials, printing techniques, product performance, packaging, and display in order to improve upon and maintain competitive advantages, adapt to changing consumer trends, react to Dollar Tree purchase orders, custom design alterations, and proprietary new product development requests, and to generally ensure that its customer relations and related revenues were maintained.

40.     As Chartwell's manufacturer, Team Impressions was privy to all of these efforts related to Dollar Tree and it was made clear to Team Impressions that this was confidential.

41.     In fact, Team Impressions has acknowledged that this information, as well as critical pricing issues, was all proprietary.  In this particular line of business, margins are thin, and thus, each of the foregoing are essential, and must be protected for a business to succeed.

42.     In June 2014, Chartwell discovered that Peel People, which was being supplied printed product from Team Impressions, was marketing and selling stickers and decals copied from Chartwell art and packaged in confusingly similar trade dress to Chartwell offerings of the same products. With this knowledge and for the many years following 2014, Neil McCallum, Chartwell CEO, had multiple and continuous in-person meetings with Tom Cipriani, a Team Impressions executive and the account representative to Chartwell, concerning the nature of the Chartwell/Team Impressions relationship and his concern that Team Impressions maintain absolute confidentiality as to proprietary product files including art designs, product specifications, formulas, and pricing information related to Dollar Tree.

Chartwell Products - Trade Dress, Marketing, and Sales

9

43. As noted, the Chartwell Products have been sold in major retailers across the United States for over fifteen years, and its market presence is well known, as it has become synonymous in the space.

44. Chartwell now produces dozens of unique products that are sold under the Chartwell Brands.

45. The Chartwell Brands have become well-known, and Chartwell has developed a sterling reputation in the industry via its sales of high-quality products at a reasonable price.

46. The commercial success of the Chartwell Brands is such that its retailer partners, including Dollar Tree, have set aside entire displays dedicated to Chartwell Products, clearly delineated by signage including the Chartwell Brands, which Chartwell has paid for. See Exhibit 2.

47. The distinctive elements of trade dress associated with the Chartwell Brands including: (i) a small header, differentiated in a different, bold color, that states at the top "Peel & Stick"; (ii) a photograph of the Products themselves in use on the right side of the header; (iii) headers in two distinctive, primary colors, depending on the brand – lime green for its Main Street Wall Creations brand and navy blue for its Scamper Studios brand; (iv) transparent packaging that allows for full display of all Products; (v) inclusion of a small green dot on the front of the package that says "Think Green" as an indicator of environmental consciousness; (vi) the Products themselves, which due to their high visibility, are a distinctive element of the trade dress; and (vii) a backside label that encourages consumers to post and share their creations on Facebook, includes the moniker "Made in the USA," contains application instructions for the Products, advises that the Products are choking hazard, and includes further reproductions of the Products.

48. Chartwell's success has been based, in large part, on its well-designed, well-made Products, that are sold in a clean, bold, modern packaging that appeals to consumers.

49. The displays at Dollar Tree stores, which include large images of the Chartwell Brands, have been instrumental in Chartwell's marketing and sales. Consumers recognize and desire the Chartwell Brands because of its distinctive logos, color schemes, and packaging.

50. Chartwell also advertises its Products via its website, www.chartwellproducts.com (the "Chartwell Website"). The Chartwell Website offers a clean, minimalist design and font that offers users a background on the Chartwell story, an overview of its products, and detail on its retail business.

<u>Team Impressions – Peel People Relationship</u>

51. As noted, Peel People's business began in 2013. At around the same time, it became a customer of, or began otherwise affiliating with Team Impressions.

52. Not long after that, Team Impressions and Peel People began working in concert with each other to compete against Chartwell, with Peel People designing and selling and Team Impressions manufacturing the products.

53. Chartwell initially had concerns when it became apparent that Peel People was selling products to other retailers that were confusingly similar to the Chartwell Products.

54. In June 2014, Chartwell confronted Team Impressions about concerns related to its dealings with Peel People and the similarity of Peel People's product to that of Chartwell. See email exchange between Jan McCallum of Chartwell and Thomas Cipriani of Team Impressions, copying Neil McCallum, attached hereto as <u>Exhibit 4</u>.

55. In this exchange, Chartwell confronted the ownership of Team Impressions with the concern that Team Impressions had shared proprietary product information with Peel People

and that Peel People was unfairly marketing those facsimile products. Team Impressions responded, writing that "Team is a manufacturer and does not control the products we manufacture." Ex. 4.

56.     Amazingly, Mr. Cipriani even admits that some of Chartwell's work was copied by Peel People: "Did they [Peel People] copy some other things too, yes, but the product is at Dollar Tree, anyone can copy the product." Ex. 4.

57.     Still, at that time, and repeatedly over the course of 2014 through 2018, Team Impressions continued to state that it was only a manufacturer, and that it had no involvement in what Peel People was doing, and denied that it was using, or sharing any of Chartwell's proprietary information with third-parties, including Peel People.

58.     Team Impressions assured Chartwell that it was not marketing or selling competing products that it had no conflicting relationship with its customers vis-a-vis Chartwell.

59.     Given its long-standing relationship with Team Impressions, and the fact that there were no outwardly apparent clues of affiliation at that time, legal or otherwise, Chartwell reasonably relied upon Team Impressions' representations, and continued to do business with Team Impressions into early 2018.

<u>Defendants' Bad Faith</u>

60.     Despite its representations to the contrary, it has recently become evident to Chartwell that Team Impressions and Peel People were in fact engaged in a concerted effort to steal Chartwell's business.

61.     Defendants' bad faith is evident from the history of dealings between the parties, overlap in roles of key personnel, and an examination of the trade dress used by Defendants, which shows a clear copying of Chartwell Products.

62.     As noted above, Team Impressions was a long-standing contractual partner of Chartwell, but at all times during that relationship, Team Impressions emphasized, and reiterated that it was "only a manufacturer" with no conflicting role in sales, marketing or distribution of like products.

63.     In 2018, Peel People began selling a number of products to Dollar Tree that were confusingly similar to the Chartwell Products. The side-by-side photographs set forth on Exhibit 1 demonstrate the striking similarities. For example, it is not simple coincidence that the Peel People began selling various alphabet poster stickers, crystal stickers, cacti, succulents, various butterfly stickers, llamas, donuts, and mandalas, all of which were strikingly similar to a corresponding Chartwell Product, and all of which came to market after the Chartwell Products. (See Ex. 1).

64.     Around the same time in 2018, purchasing department personnel at Dollar Tree confirmed to Chartwell that Peel People had become an alternative supplier of choice over Chartwell for certain copied peel-and-stick product items.

65.     At that time, Chartwell was not yet certain that Team Impressions was working with Peel People, but it questioned how Peel People could possibly be selling to Dollar Tree at price points that were so low, particularly since the business is already subject to extremely fine margins.

66.     Later, though, it became apparent: the vertical integration with Team Impressions, and the use of Chartwell products allowed Peel People to save significantly, and thus, sell to Dollar Tree at lower prices.

67.     In hindsight, this comports with the fact that in 2017, Chartwell had asked Team Impressions to bear some of the burden of Dollar Tree's requests for pricing concessions, only for

Team Impressions to refuse, which ultimately led to Chartwell's initial decision to seek an alternative manufacturer for its products. Team Impressions did not agree to share in pricing concessions with Chartwell because it was profiting off sales as or with a Chartwell competitor.

68.     In order to retain its business with Dollar Tree, Chartwell was forced to meet these lower prices, which cost Chartwell approximately five cents ($00.05) on each product sold – a huge loss in revenue for Chartwell.

69.     By 2019, the scheme by Team Impressions and Peel People was no longer clandestine, but had instead become brazen and obvious.

70.     Chartwell came to have knowledge in August 2019 that Mr. Mark Meccia, a Team Impressions employee, was also serving as a Peel People sales executive and was calling directly on Dollar Tree purchasing department personnel.

71.     Neil McCallum, while signing in to a meeting with a buyer in Dollar Tree's Virginia headquarters, noticed that Mr. Meccia had signed in for a meeting with the same representative earlier that day. He did so as a representative of Peel People. Mr. McCallum then noticed Mr. Meccia walking out of the building.

72.     After further investigation, it became even more apparent that Mr. Meccia was serving both entities. His LinkedIn page lists his current role as "VP Sales & Marketing at Team Impressions, Inc." whereas a Dun & Bradstreet corporate information search identifies Mr. Meccia as the principal and CEO of Peel People, LLC. See Information regarding Mark Meccia roles, attached hereto as Exhibit 5.

73.     In addition to the foregoing instances of price manipulation, and clear misrepresentations regarding roles, the products themselves demonstrate the obvious nature of the Defendants' malfeasance.

74.     The Defendant Products were all packaged in exactly the same way as the Chartwell Products, and included numerous elements that were copied from the Chartwell Products.  From a technical perspective, the only way that these products could be so strikingly similar would be if they used Chartwell's digital production files, which Team Impressions had access to.  To further demonstrate the undisputable misuse of Chartwell's production files and trade dress, Exhibit 6 attached hereto depicts Chartwell's and Peel People's respective products over-laid upon each other. The remarkable likeness of trade dress and the essence of Chartwell's products cannot be coincidental.

75.     The production files are what are ultimately used by a printer/manufacturer to create plates, which are then utilized to manufacture the physical product.  Even the best third-party designer could not create a product that is so strikingly similar to the Chartwell Products in so many ways.

76.     Defendant Products include: (i) a small header, differentiated in a different, bold color, that states at the top "Peel & Stick"; (ii) a photograph of the Products themselves in use on the right side of the header; (iii) headers in two distinctive, primary colors, depending on the brand – lime green for its generic "Peel and Stick" brand and navy blue for its "DIY Décor" brand; (iv) transparent packaging that allows for full display of all Products; (v) inclusion of a small green dot on the front of the package that says "Go Green" as an indicator of environmental consciousness; (v) the Products themselves, which due to their high visibility, are distinctive; (vii) a backside label that encourages consumers to post and share their creations on Facebook, includes the moniker "Made in the USA," contains application instructions for the Products, advises that the Products are choking hazard, and includes further reproductions of the Products.

77.     The Defendant Products are identical in size, dimensions, layout, and overall gestalt to the Chartwell Products.  Each of these components of Defendant Products infringes upon the Chartwell Products and trade dress.  This is particularly evident when viewed in the aggregate, and the respective products are viewed side-by-side. See Exhibit 1 and Exhibit 2.

78.     Furthermore, in a more subtle indicator that Defendants stole Chartwell Products, they copied a part of the design that was a Chartwell-specific indicator to retailers regarding the stocking of Chartwell Products in Chartwell-owned displays.  Specifically, right under the SKU number on the upper right-hand corner of the back of the packaging, the Chartwell products have an indicator that says, "Décor Rack."  This indicates to stock personnel at Dollar Tree where to place the product.  Defendants copied this scheme, and their products say "Graphics Rack" in the same location.

79.     On the whole, it is simply unfeasible that Defendants could have mirrored each and every distinctive element of the Chartwell Products to this extent but for their flagrant, willful copying of the Chartwell Products.

80.     It is abundantly clear that Defendants began selling the Defendant Products in a direct attempt to steal Chartwell's trade dress and designs, and undercut Chartwell by unfairly competing in the marketplace.

81.     Defendants are not even trying to hide the fact that their entire business model is based on copying Chartwell.  The respective websites for Chartwell and Peel People, used to market products, are also strikingly similar.  Both contain the same minimalist design and font. See www.thepeelpeople.com.  A sample screen capture of both sites is attached hereto as Exhibit 7.  Peel People clearly tried to copy every single element of Chartwell's business.

16

82.     When viewed in the context of the timeline of the Team Impressions-Peel People relationship, this nefarious plot becomes even more obvious.

<u>Confusion and Likelihood of Confusion</u>

83.     Given the striking similarity between the parties' respective products and trade dress, there is a high likelihood that consumers and retailers will confuse the products.

84.     In fact, there is evidence that confusion in the marketplace has already occurred. As evidenced in <u>Exhibit 2</u>, Dollar Tree has already started intermingling Defendant Products and Chartwell Products, specifically offering for sale the Defendant Products in display cases clearly marked for Chartwell Products.

85.     This retailer confusion and placement further exacerbates the likelihood of confusion as to the end consumer, who has no reasonable way to discern the origin of the products.

86.     In fact, Defendants' conduct has caused actual consumer confusion.  In a YouTube® video from a brand influencer that creates content in the arts and crafts space under the title "Thrifted Living" the person in the video is displaying and discussing potential uses for Chartwell's Main Street Wall Creations decals, when she happens upon one of Defendants' decals, and expresses confusion as to the origin of the same.

87.     The YouTube video showing actual consumer confusion is available at: https://www.youtube.com/watch?v=Sg26lM8O8VM&t=230s.    The confusion is illustrated throughout, including at the 2:48 mark, when the presenter expresses that she "doesn't know" whether the products being discussed are Main Street (Chartwell) brand (they are not), and again at 3:54 when she shows the Defendants' llama decals, and this time, the person in the video does not even notice that the product is not a Chartwell Product.

17

88. The Thrifted Living YouTube page has over 84,200 followers, and the video linked above has over 4,259 views, meaning additional consumers are being exposed to this confusion, just from watching these videos.

Chartwell Trade Secrets

89. Chartwell's trade dress, including the actual designs, are not the only components of the Chartwell Products that Defendants' had access to, that allowed it to gain an unfair advantage in the marketplace.

90. Since its inception, Chartwell has devoted significant resources to research and development in order to establish technical specifications for the Chartwell Products that are both trendy and artful, but that also present the highest performance standard in the industry for removable wall decals consistent with the desires and demands of consumers.

91. For example, with its own team of printing specialists and technicians, Chartwell spent considerable monies developing the optimized and proprietary marriage of compatible paper backing materials, print surfaces of film and foil, metallic inks, and specialized adhesives and glues which would achieve the required performance results and quality standards of its customers.

92. All of these efforts required Chartwell to incur significant time and expense.

93. In addition, Chartwell has spent its entire existence working on processes, work flow procedures, and other day-to-day operational efficiencies that allowed it to set competitive pricing in an industry where margins are often extremely thin.

94. Team Impressions, as its manufacturer, was privy to the key components of Chartwell's pricing and sales figures. As noted above, this allowed Defendants to offer Dollar Tree competitive products that forced Chartwell to lower its prices by approximately five cents per unit, greatly diminishing its revenue.

18

95.     Chartwell undertook to keep its technical specifications, testing, and related research and development secret, sharing it only with those parties who needed to know this information to produce the Chartwell Products.  This included the proprietary production files that Chartwell provided to Team Impressions in order to manufacture its products.

96.     Chartwell chose to develop its technologies and specifications within its own team of specialists with the intent of maintaining its trade secrets and technical advantages from other decal developers and marketers.  Under certain circumstances, Chartwell was required to divulge these specifications to Team Impressions as part of the manufacturing process.  Team Impressions was aware of the confidential nature of this information. In sharing this information, Chartwell relied upon Team Impressions' representations that it was a manufacturer and not a marketer and seller of such decal products.

97.     All of the above is clearly sufficient to derive economic value.  Defendants have not had to do any product research and development, they have not had to employ creative personnel to develop designs that are attractive to consumers, they have utilized this information to sell to retailers and consumers at preferred price points and undercut Chartwell's prices, and they have used all of this to usurp Chartwell's business.

<u>Irreparable Harm</u>

98.     Defendants have gone far beyond fair competition, and have clearly engaged in a concerted effort to copy the Chartwell Products, confuse consumers, and nudge Chartwell out of the marketplace.

99.     If Defendants are allowed to continue, Chartwell will suffer irreparable harm. Chartwell will continue to lose sales and revenue, both to retailers and consumers.

100. Chartwell has spent most of its existence building up strong relationships with retailers, and building a sterling reputation in the industry, but this good will is seriously threatened by Defendants.

101. Furthermore, Chartwell simply cannot sustain the margins required to stay in business in an industry where products are sold at such a low price point (including at Dollar Tree, other dollar stores and other discount retailers), when Defendants are allowed to unfairly compete by copying the trade dress and the essence of products while having access to its confidential information.

102. Defendants cannot be allowed to continue to cut corners, undercut Chartwell and thereby cripple Chartwell's efforts to maintain or grow its business.

## COUNT I
### (Trade Dress Infringement, False Designation of Origin and False Advertising under Section 43(a) of the Lanham Act (41 U.S.C. § 1125(a))
### *Team Impressions and Peel People*

103. Chartwell reasserts and realleges each and every allegation contained in Paragraphs 1-102 above as though fully set forth herein.

104. The trade dress components of the Chartwell Products are non-functional, inherently distinctive and have acquired secondary meaning in the marketplace. In particular, as evidenced by the YouTube video described above, the Main Street brand has established a sterling reputation in the arts and crafts space, drawing praise from key influencers, who clearly recognize the product based upon its distinctiveness at Dollar Tree and elsewhere.

105. The Defendant Products, which are now being used in commerce, feature trade dress that is substantially and confusingly similar to the trade dress of the Chartwell Products, and is being sold and marketed through a scheme designed to confuse retailers and consumers.

20

106. Defendants' manufacture, distribution, sale, and promotion of the Defendant Products, thus, has caused confusion, and is likely to continue to cause confusion and mistake and deceive retailers and consumers as to the source, origin, and sponsorship of the parties' products. Consumers that see the Defendant Products in the marketplace are likely to believe that the goods originated from, are associated with, or are otherwise affiliated with the Chartwell Products, or vice versa.

107. The display of Defendant Products next to, adjacent to, or mixed in with Chartwell Products implies that the parties' products come from the same source, as exacerbated by the identical size, design, and overall trade dress of the Defendant Products.

108. Defendants' acts of unfair competition, trade dress infringement, false designation of origin, and false advertising, unless restrained, will continue to cause great and irreparable injury to Chartwell and to the business and good will that Chartwell has built over its history. The exact amount of this ongoing harm cannot be ascertained, and thus, Chartwell has no adequate remedy at law.

109. Such irreparable, ongoing harm is in addition to the actual damages that Chartwell has already sustained as a result of lost sales directly caused by Defendants' conduct.

110. Defendants' conduct constitutes false designation of origin, infringement of trade dress, and false advertising in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

WHEREFORE, Chartwell respectfully requests that this Court grant judgment in its favor on this Count I for violations of Section 43(a) of the Lanham Act, and grant it relief in the form of actual damages, injunctive relief, and such other relief this court deems just and appropriate.

## COUNT II
### (Unfair Competition 815 ILCS 505/1 et seq.)
### *Team Impressions and Peel People*

111.    Chartwell reasserts and realleges each and every allegation contained in Paragraphs 1-110 above as though fully set forth herein.

112.    The elements that must be proven to sustain a private cause of action under the Illinois Consumer Fraud and Deceptive Business Practices Act include the following: (1) a deceptive act or practice by the defendant; (2) the defendant intended the plaintiff to rely on the deception; (3) the deception occurred in the course of conduct involving trade or commerce; and (4) actual damages sustained as a proximate cause of the deception.

113.    Defendants have committed numerous deceptive acts and practices, including lying to Chartwell about its efforts in sales and distribution of products, concealment of the relationship between Team Impressions and Peel People, engaging in a scheme to ensure that it's products would be displayed side-by-side with Chartwell Products in Chartwell displays, and production of packaging and products that are essentially identical to Chartwell Products.

114.    Defendants clearly intended for Chartwell to rely on its false statements so that Chartwell would continue doing business with Team Impressions, and so that Chartwell would not discover Defendants' nefarious scheme.

115.    Defendants also clearly intended for its products and packaging to be substantially similar to Chartwell Products so that consumers of the products would not be able to reasonably discern Chartwell Products from the Defendant Products.

116.    These actions all occurred in the course of trade and commerce.

117.    Chartwell has suffered actual damages in the way of lost sales and profits.

WHEREFORE, Chartwell respectfully requests that this Court grant judgment in its favor on this Count II for violations of the Illinois Consumer Fraud and Deceptive Business Practices

Act, and grant it relief in the form of actual damages, attorneys' fees and costs, punitive damages, injunctive relief, and such other relief this court deems just and appropriate.

**COUNT III**
**(Misappropriation of Trade Secrets under 765 ILCS 1065/1 et seq.)**
*Team Impressions and Peel People*

118.     Chartwell reasserts and realleges each and every allegation contained in Paragraphs 1-117 above as though fully set forth herein.

119.     The elements of a claim for misappropriation of trade secrets under the Illinois Trade Secrets Act are as follows: (1) a trade secret existed; (2) the secret was misappropriated through improper acquisition, disclosure, or use; and (3) the owner of the trade secret was damaged by the misappropriation.  See 765 ILCS 1065/1 *et seq*; *Liebert Corp. v. Mazur*, 827 N.E.2d 909, 925 (Ill. App. 1st 2005).

120.     A trade secret is defined as:

Information, including but not limited to, technical or non-technical data, a formula, pattern, compilation, program, device, method, technique, drawing, process, financial data, or list of actual or potential suppliers, that: (1) is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value form its disclosure or use; and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality under the Act.  765 ILCS 1065/2(d).

121.     As detailed, Chartwell had significant trade secrets that were shared with Team Impressions on a confidential basis, and only for the purpose of manufacturing its products.  Such trade secrets included pricing models, production files, designs, specific product specifications and technical components of its decals, and other key elements of its trade dress.

122.     Here, Chartwell's confidential information misappropriated by Defendants was sufficiently secret to derive economic value.

123.     The pricing information is economically valuable because it allows Chartwell to solicit business from its clients at preferred pricing margins that allow Chartwell's business to continue to operate.  In an industry such as this with low price points, fine margins are absolutely essential.  By having access to Chartwell's pricing models, Team Impressions and Peel People were able to match and undercut Chartwell's pricing to a level that rendered continued business with Dollar Tree and other customers impossible.

124.     The technical specifications and production files are, likewise, of critical economic importance because Chartwell has spent years, and significant cost expenditures to develop and strengthen its product specifications to ensure that the products met the quality assurance standards of its clients, including Dollar Tree.  Defendants were able to simply take that information, invest little research and development of their own into products, and replicate the same at a lower cost to undercut Chartwell.

125.     The Chartwell Trade Secrets, including as detailed in Paragraphs 90 through 98 above, are inherently economically valuable.  Without access to this information, Defendants would have had to spend countless hours and spend real dollars to develop their own product specifications, research and understand pricing factors within the industry.  Without misappropriating The Chartwell Trade Secrets, Defendants would have had to invest heavily to acquire the necessary industry know-how that would have been required to fairly compete with Chartwell.  Instead, they took unlawful shortcuts to gain an unfair advantage.

126.     Chartwell undertook reasonable efforts to protect and maintain the secrecy of its Trade Secrets. Chartwell safeguards its design creations in secure password, and administrator protected storage files; it has consistently developed its printing materials (paper, film and foil

materials together with adhesives) in secret and supplies such to its printing vendors as proprietary methods and formulas, and only on an as-needed basis.

127.    These facts clearly demonstrate that (a) the Chartwell Trade Secrets meet the definition contained in Section 1065/2 of the Illinois Trade Secrets Act, and (b) that Defendants misappropriated the same, to their benefit.

128.    Section 1065/3 of the Illinois Trade Secrets Act provides for injunctive relief to protect trade secrets:

> Actual or threatened misappropriation may be enjoined.  Upon application to the court, an injunction may be terminated when the trade secret has ceased to exist, provided that the injunction may be continued for an additional reasonable period of time in appropriate circumstances for reasons including, but not limited to an elimination of the commercial advantage that otherwise would be derived from the misappropriation, deterrence of willful and malicious misappropriation, or where the trade secret ceases to exist due to the fault of the enjoined party or others by improper means.  765 ILCS 1065/3(a).

129.    This Section of the Illinois Trade Secrets Act also provided that if it would be unreasonable to enjoin future use due to an overriding public interest, future use may be conditioned upon payment of a reasonable royalty, and in appropriate circumstances, affirmative acts to protect trade secrets may be compelled.  765 ILCS 1065(3)(b)-(c).

130.    In this case, the overwhelming facts demonstrate that Defendants' theft of Chartwell's trade secretes was willful and malicious – they saw an opportunity to take advantage of a successful business model by copying it in nearly every material respect to their own economic benefit.

131.    No other Chartwell competitor would have the opportunity to compete in the same manner, and Defendants were only able to do so as a result of their wrongful conduct.

WHEREFORE, Chartwell respectfully requests that this Court grant judgment in its favor on this Count III, award it damages, attorneys' fees and costs, and punitive damages, and enter an

order providing for preliminary and permanent injunctive relief in its favor and against Defendants, including, but not limited to the following relief:

    a.   enjoin Defendants from directly or indirectly servicing Chartwell clients, including Dollar Tree;

    b.   enjoin Defendants from directly or indirectly utilizing any of Chartwell's vendors or any other parties that may have information regarding Chartwell's Trade Secrets;

    c.   enjoin Defendants from any further disclosure or use of Chartwell trade secrets, including destruction and/or return of the same; and

    d.   such other relief this Court deems just and appropriate.

<u>**COUNT IV**</u>
**(Fraudulent Misrepresentation)**
***Team Impressions***

132.    Chartwell reasserts and realleges each and every allegation contained in Paragraphs 1-131 above as though fully set forth herein.

133.    In 2014, Chartwell first grew curious regarding the relationship between Team Impressions and Peel People. Jan McCallum, then Chartwell CEO, made specific inquiries to Team Impressions personnel regarding Team Impressions manufacturing "copied" product for the Peel People.

134.    In the June 2014 email exchange with Thomas Cipriani of Team Impressions, Mr. Cipriani made numerous false representations to Mrs. McCallum, which were intended to, and did in fact lead her to rely upon his representations that Team was only a manufacturer of products, and that it had no control over what products it manufactured. See <u>Ex. 4</u>.

135.    As late as January of 2018, Tom Cipriani of Team in an email communication to Neil McCallum of Chartwell reiterated "I have often told you, we don't and won't manufacture

product for Dollar Wall Décor Decals, as we did not want competition for Chartwell. Your response was 'You understand'." This statement was knowingly false and deceptive. See <u>Exhibit 8</u>.

136.     As a result of these representations and assurances, Chartwell continued to do business with Team Impressions, which necessarily included continued access to Chartwell Products and other critical business information such as the Chartwell Trade Secrets.

137.     Given that Chartwell and Team Impressions had a long-time business relationship, Chartwell justifiability relied upon the reassurances from Team Impressions that it was not using Chartwell Products or Chartwell Trade Secrets for any improper purpose – namely, supplying the same to Peel People in order to compete with Chartwell.

138.     The statements made by Team Impressions, however, were false. Team Impressions were clearly acting in concert with Peel People, and had provided Peel People with Chartwell's artwork, designs, technical specifications, and other Chartwell Trade Secrets.

139.     The statements made by Team Impressions were intended to induce Chartwell to continue to do business with Team Impressions, and to conceal what was really going on – that the Chartwell Products were being stolen in virtually every facet.

140.     The false statements intended to induce action and conceal facts were made willfully, wantonly, and with the intent to defraud Chartwell.

141.     As a direct and proximate result thereof, Chartwell did, in fact, continue to do business with Team Impressions for several more years, and did not discover what was transpiring until late 2018 and into 2019.

142.     This caused actual damage to Chartwell.

WHEREFORE, Chartwell respectfully requests that this Court enter judgment in its favor on this Count IV, and award it monetary damages, attorneys' fees and costs, punitive damages, and such other relief that this Court deems just and appropriate.

## COUNT V
### (Tortious Interference with Business Relationships)
### *Team Impressions and Peel People*

143.    Chartwell reasserts and realleges each and every allegation contained in Paragraphs 1-142 above as though fully set forth herein.

144.    Chartwell had a long-standing business relationship with Dollar Tree.

145.    Because Team Impressions' business relationship with Chartwell was for the purpose of printing Chartwell Products for sale and distribution to Dollar Tree, Team Impressions had actual knowledge of this relationship.

146.    Likewise, as a competitor of Chartwell, and the entity that wrongfully infringed upon the Chartwell Products for the purpose of competing, and given its close affiliate relationship to Team Impressions, Peel People also had knowledge of Chartwell's business relationship with Dollar Tree.

147.    Team Impressions and Peel People engaged in intentional, wrongful efforts to interfere with the Chartwell-Dollar Tree relationship.

148.    Such efforts included, but were not limited to:

a.    communicating with Dollar Tree, and selling Dollar Tree the Defendant Products that were copied from Chartwell, and were intended to replace Chartwell Products;

b.    manufacturing products that infringed upon, and were intended to serve as a facsimile of the Chartwell Products;

c.  misappropriating Chartwell's technical specifications and using its production files to ensure that the Defendant Products met Dollar Tree's quality standards and closely mirrored the Chartwell Products; and

d.  misappropriating Chartwell's pricing data so that Defendants could ensure that its own offerings to Dollar Tree were provided at a price point that would undercut Chartwell, and make it impossible or nearly impossible for Chartwell to compete by offering a lower price.

149.  As a direct and proximate result of Defendants' conduct, Dollar Tree did, in fact, cease doing significant business with Chartwell.

150.  As a result of this lost business, Chartwell suffered actual damages.

WHEREFORE, Chartwell respectfully requests that this Court enter judgment in its favor on this Count V, grant injunctive relief, and award it monetary damages, attorneys' fees and costs, punitive damages, and such other relief this Court deems just and proper.

## COUNT VI
### (Conspiracy to Tortiously Interfere)
### *Team Impressions and Peel People*

151.  Chartwell reasserts and realleges each and every allegation contained in Paragraphs 1-150 above as though fully set forth herein.

152.  Defendants, which were affiliated, had an agreement to engage in concerted efforts to copy Chartwell's products, and then use the same to divert Chartwell's customers to Peel People.

153.  These efforts included intentional false statements and acts of concealment to prevent Chartwell from discovering the Defendants' motives and conduct.

154.  Team Impressions knew it could continue working with Chartwell, all the while building its business with Peel People in order to unfairly compete with Chartwell.

155.    Over a period of time, Defendants lulled Chartwell into a sense of security, while collecting further information on its overall business, including its products, pricing, and other key components, in order to develop their own line of business.

156.    All Defendants participated in this common scheme.

157.    This scheme was employed to, and did in fact, cause interference with Chartwell's business relationship with Dollar Tree.

158.    Defendants' conduct was intentional, and they knew that they were interfering with Chartwell's relationship with Dollar Tree.

159.    Defendants' conduct in furtherance of this conspiracy caused Chartwell to lose an immeasurable amount of business in the form of lost sales, and damage to its good will and reputation, which cannot be fully compensated through money damages.

WHEREFORE, Chartwell respectfully requests that this Court enter judgment in its favor on this Count VI, grant injunctive relief, and award it monetary damages, attorneys' fees and costs, punitive damages, and such other relief this Court deems just and proper.

## <u>JURY TRIAL DEMAND</u>

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury in this action of all issues so triable.

CHARTWELL STUDIO, INC.


By:_____/s/Brian C. Konkel_____
       One of its Attorneys

       DUGGAN BERTSCH, LLC
       Timothy Liam Epstein, Esq.
       Brian C. Konkel, Esq.
       303 West Madison – Suite 1000
       Chicago, IL  60606
       (312) 263-8600
       tepstein@dugganbertsch.com
       bkonkel@dugganbertsch.com

**IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | | |
|---|---|---|
| CHARTWELL STUDIO, INC. | ) | |
| | ) | |
| Plaintiff, | ) | Case No.: 1:19-cv-06944 |
| | ) | |
| v. | ) | |
| | ) | |
| TEAM IMPRESSIONS, INC. | ) | |
| THE PEEL PEOPLE, LLC | ) | |
| | ) | |
| Defendants. | ) | |

**CHARTWELL STUDIO, INC.'S
<u>LOCAL RULE 3.2 NOTIFICATION OF AFFILIATES</u>**

Plaintiff, Chartwell Studio, Inc., pursuant to Local Rule 3.2, hereby states that it is a nongovernmental party that has no publicly held affiliates.

CHARTWELL STUDIO, INC.


By:_____/s/Brian C. Konkel_____
One of its Attorneys

DUGGAN BERTSCH, LLC
Timothy Liam Epstein, Esq.
Brian C. Konkel, Esq.
303 West Madison – Suite 1000
Chicago, IL 60606
(312) 263-8600
tepstein@dugganbertsch.com
bkonkel@dugganbertsch.com