**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| CHARTWELL STUDIO, INC., | |
| Plaintiff, | |
| v. | Case No. 19-cv-06944 |
| TEAM IMPRESSIONS, INC. and THE PEEL PEOPLE, LLC, | Judge Mary M. Rowland |
| Defendants. | |

## MEMORANDUM OPINION AND ORDER

Since 2002, Plaintiff Chartwell Studio, Inc. ("Chartwell") has produced stickers and wall decals and sold them to retailers including the Dollar Tree store. In this lawsuit, Chartwell claims that Team Impressions, Inc. ("Team Impressions") and The Peel People, LLC ("Peel People") (collectively, "Defendants") infringed Chartwell's trade dress and interfered with its relationship with the Dollar Tree store. In its six-count Complaint, Chartwell alleges violations of the Lanham Act, Illinois Consumer Fraud and Deceptive Business Practices Act, and Illinois Trade Secrets Act, as well as fraudulent misrepresentation, tortious interference with business relationships, and conspiracy to tortiously interfere with business relationships. Defendants move to dismiss all counts in the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).

For the reasons stated below, Team Impressions and Peel People's Motion to Dismiss [18] is granted in part and denied in part.

1

### I.   Background

The following factual allegations are taken from the Complaint (Dkt. 1, "Compl.") and are accepted as true for the purposes of the motion to dismiss. *See W. Bend Mut. Ins. Co. v. Schumacher*, 844 F.3d 670, 675 (7th Cir. 2016).

Chartwell specializes in the design, development, and production of home décor products, such as stickers and wall decals. (Compl. ¶ 23). The company is well-known in the industry for selling high-quality products at a reasonable price. (*Id.* ¶ 45). Consumers recognize its products through, among other things, the packaging of those products. (*Id.* ¶ 49).

Between 2004 and 2018, manufacturer Team Impressions printed and packaged Chartwell's products. (*Id.* ¶¶ 2, 32). Chartwell then sold the products to its major retail customers, including Dollar Tree, which has approximately 15,000 stores throughout the U.S. and Canada. (*Id.* ¶ 36). Over the course of its 15-year relationship with Dollar Tree, Chartwell sold Dollar Tree more than 50 million stickers and wall decals. (*Id.* ¶ 38). With Team Impressions, Chartwell shared certain confidential information about its products, including production files, and Team Impressions was aware of the confidential nature of the information. (*Id.* ¶¶ 94-96). Chartwell shared such information on a confidential basis only for Team Impressions to manufacture its products. (*Id.* ¶ 121).

Around 2013, Peel People, a competitor of Chartwell, began its business relationship with Team Impressions. (*Id.* ¶¶ 51-52). In June 2014, Chartwell discovered that Peel People was being supplied printed product from Team

2

Impressions, and was selling stickers and decals that looked similar to those sold by Chartwell and used packaging that resembled Chartwell packaging. (*Id.* ¶ 42). On June 13, 2014, Jan McCallum of Chartwell sent Thomas Cipriani of Team Impressions an email, claiming that Peel People was copying Chartwell's product content and brand look and expressed disappointment that Team Impressions failed to warn Chartwell about this. (*Id.* ¶¶ 54-55; Exh. 4). Cipriani replied that Team Impressions is a manufacturer "and does not control the products we manufacture." (*Id.*). Cipriani also stated that when Peel People wants to "run a similar product to the Dollar Tree product, we can't very well say no", and "the product is at Dollar Tree, [sic] anyone can copy the product." (*Id.*).

Still, according to Chartwell, from 2014 to 2018, Team Impressions repeatedly confirmed that it was only a manufacturer, that it was not involved in "what Peel People was doing", and that it did not use or share any of Chartwell's proprietary information with third parties, including Peel People. (*Id.* ¶ 57). On multiple occasions after 2014, McCallum met in person with Cipriani to discuss the relationship between the two companies and discuss his concern that Team Impressions maintain the confidentiality of Chartwell's proprietary product files. (*Id.* ¶ 42).

In 2018, Peel People started selling certain products to Dollar Tree that looked similar to Chartwell products. (*Id.* ¶¶ 63, 77). Chartwell could only conclude that Peel People must have used its production files. (*Id.* ¶¶ 74-75, 79). Around the same time, Dollar Tree's purchasing department informed Chartwell that Peel People had

become an alternative supplier of choice over Chartwell for certain peel-and-stick items. (*Id.* ¶ 64). Peel People was charging Dollar Tree a price that was unreasonably low given the industry's extremely fine margins. (*Id.* ¶ 65). Following an unsuccessful negotiation to have Team Impressions share part of the price concessions requested by Dollar Tree, Chartwell and Team Impressions terminated their relationship in early 2018. (*Id.* ¶¶ 2, 67).

As a result of Defendants' alleged conduct, Chartwell's sales volume to Dollar Tree dropped 26% from 2018 to 2019 and Chartwell suffered price concessions with Dollar Tree totaling $480,000 to date. (*Id.* ¶ 12). Chartwell faces great difficulty in sustaining margins required for staying in business and expects to continue losing sales and revenue if Defendants' conduct continues. (*Id.* ¶¶ 99-101).

## II. Standard

A motion to dismiss tests the sufficiency of a complaint, not the merits of the case. *Gibson v. City of Chicago,* 910 F.2d 1510, 1520 (7th Cir. 1990). "To survive a motion to dismiss under Rule 12(b)(6), the complaint must provide enough factual information to state a claim to relief that is plausible on its face and raise a right to relief above the speculative level." *Haywood v. Massage Envy Franchising, LLC*, 887 F.3d 329, 333 (7th Cir. 2018) (quotations and citation omitted). *See also* Fed. R. Civ. P. 8(a)(2) (requiring a complaint to contain a "short and plain statement of the claim showing that the pleader is entitled to relief."). A court deciding a Rule 12(b)(6) motion accepts plaintiff's well-pleaded factual allegations as true and draws all permissible inferences in plaintiff's favor. *Fortres Grand Corp. v. Warner Bros. Entm't*

4

*Inc.*, 763 F.3d 696, 700 (7th Cir. 2014). A plaintiff need not plead "detailed factual allegations", but "still must provide more than mere labels and conclusions or a formulaic recitation of the elements of a cause of action for her complaint to be considered adequate under Federal Rule of Civil Procedure 8." *Bell v. City of Chi.*, 835 F.3d 736, 738 (7th Cir. 2016) (citation and internal quotation marks omitted). Dismissal for failure to state a claim is proper "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558, 127 S. Ct. 1955, 1966 (2007). Deciding the plausibility of the claim is "'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *McCauley v. City of Chi.*, 671 F.3d 611, 616 (7th Cir. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679, 129 S. Ct. 1937, 1950 (2009)).

When a complaint alleges fraud, the heightened Rule 9(b) standard applies, requiring the pleading to "'state with particularity the circumstances constituting fraud.'" *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 737 (7th Cir. 2014) (quoting Fed. R. Civ. P. 9(b)). Both "common-law and statutory fraud claims must be pleaded with the detail required under Rule 9(b)'s heightened standard.*" Newman v. Metro. Life Ins. Co.*, 885 F.3d 992, 998 (7th Cir. 2018). "While the precise level of particularity required under Rule 9(b) depends upon the facts of the case, the pleading ordinarily requires describing the who, what, when, where, and how of the fraud." *Camasta,* 761 F.3d at 737 (internal citation and quotations omitted).

## III.    Analysis

Defendants move to dismiss the Complaint with prejudice. With the exception of the fraudulent misrepresentation claim, alleged against Team Impressions only, Chartwell's claims are brought against both Defendants.[1]

### A. Trade Dress Infringement (Count I)

#### 1. The Trade Dress

Chartwell alleges infringement of its trade dress under the Lanham Act, 15 U.S.C. § 1125(a).[2] "It is well established that trade dress can be protected under federal law. The design or packaging of a product may acquire a distinctiveness which serves to identify the product with its manufacturer or source; and a design or package which acquires this secondary meaning, assuming other requisites are met, is a trade dress which may not be used in a manner likely to cause confusion as to the origin, sponsorship, or approval of the goods." *TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 28 (2001). "'Trade dress' is the 'total image or overall appearance of a product,' including size, shape, color, texture, and graphics." *AM Gen. Corp. v. Daimlerchrysler Corp.*, 311 F.3d 796, 814 (7th Cir. 2002) (internal citations omitted).

---

[1] For the state law claims, jurisdiction is based on supplemental jurisdiction, 28 U.S.C. § 1367(a). The parties do not dispute that Illinois law applies.

[2] Chartwell claims "false designation of origin, infringement of trade dress, and false advertising" under § 1125(a). (Comp. ¶ 108). However, the Court does not read the Complaint as alleging a claim of false designation of origin or false advertising separate from the trade dress infringement claim. *See Weber-Stephen Prod. LLC v. Sears Holding Corp.,* 2013 WL 5782433, at *1 n.2   (N.D. Ill. Oct. 25, 2013), at (treating plaintiff's claims for unfair competition, false designation origin and trade dress infringement as a single trade dress infringement claim).

To allege trade dress infringement under § 1125(a), a plaintiff must describe the asserted trade dress in some detail. *Weber-Stephen Prod. LLC v. Sears Holding Corp.*, 2013 WL 5782433, at *4 (N.D. Ill. Oct. 25, 2013) (citing *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 765 (1992)); *Mighty Deer Lick, Inc. v. Morton Salt, Inc.*, 2020 U.S. Dist. LEXIS 23206, at *22 (N.D. Ill. Feb. 11, 2020) ("[plaintiff] must provide enough detail to put Morton on notice as to what [plaintiff] believes constitutes its protectable trade dress.").

Chartwell claims that its trade dress comprises the following elements:

> (i) a small header, differentiated in a different, bold color, that states at the top "Peel & Stick"; (ii) a photograph of the Products themselves in use on the right side of the header; (iii) headers in two distinctive, primary colors, depending on the brand – lime green for its Main Street Wall Creations brand and navy blue for its Scamper Studios brand; (iv) transparent packaging that allows for full display of all products; (v) inclusion of a small green dot on the front of the package that says "Think Green" as an indicator of environmental consciousness; (vi) the products themselves, which due to their high visibility, are a distinctive element of the trade dress; and (vii) a backside label that encourages consumers to post and share their creations on Facebook, includes the moniker "Made in the USA," contains application instructions for the Products, advises that the products are choking hazard, and includes further reproductions of the products.

(Compl. ¶ 47).

Defendants argue that "[n]one of these elements alone or in combination constitute protectible trade dress." (Dkt. 18 at 5). The Court disagrees. Chartwell has pled seven specific elements of its trade dress and attaches to its Complaint images of the alleged trade dress. (Compl. ¶ 47, Exhs. 1-2.). *See Weber-Stephen*, 2013 WL 5782433, at *4 (reviewing allegations in complaint and photographs to identify

alleged trade dress). However, Chartwell's Complaint and response brief do create confusion about the scope of the trade dress.

First, the Complaint uses the word "including" to refer to the elements of the trade dress and Chartwell states in its response brief that the listed elements "standing alone and in combination" comprise its trade dress (Dkt. 22 at 5). At the same time, Chartwell stresses that its trade dress must be viewed according to the "total image" and "overall gestalt." (*Id.* at 5, 6). Chartwell's asserted trade dress cannot be unlimited in scope. *See Weber-Stephen Prods.,* 2013 WL 5782433, at *3 ("Weber must place a limit on the trade dress it would like to claim."); *see also Flexible Steel Lacing Co. v. Conveyor Access., Inc.*, 955 F.3d 632, 643 (7th Cir. 2020) ("The Supreme Court has cautioned against overextending trade dress protection, [] because it 'almost invariably serves purposes other than source identification.'"). Therefore, the Court construes Chartwell's trade dress as the overall look created by the seven listed elements *in combination.* (Compl. ¶ 47). That description, combined with the images attached to its Complaint, gives Defendants sufficient notice of its claimed trade dress. *See Weber-Stephen*, 2013 WL 5782433, at *4 (plaintiff's alleged trade dress, as narrowed by the court, gave defendant sufficient notice at the pleading stage).

Defendants also challenge Chartwell's description of its trade dress to the extent it references the products themselves (the stickers and decals). *See* Compl. ¶¶ 4, 7-8, 61, 63, 77 (the "copying of the decals and stickers is problematic… Even the packaging was identical or nearly identical…in order to deceive consumers and capitalize upon the confusing similarity between the products, in a clear case of trade dress

infringement."). Defendants maintain that the alleged copying of products themselves is not actionable. (Dkt. 18 at 7; Dkt. 24 at 5-6). *See TrafFix,* 532 U.S. at 29 ("Trade dress protection must subsist with the recognition that in many instances there is no prohibition against copying goods and products. In general, unless an intellectual property right such as a patent or copyright protects an item, it will be subject to copying.").[3] However as the Court reads the Complaint, the trade dress is the overall look of the packaging, and the appearance of the product *in the packaging* is an element of the trade dress. Compl. ¶¶42, 47, 76, 78, Exhs. 1, 2, 6. Indeed, in defining its trade dress, Chartwell expressly states that the Products themselves, because of their visibility in the packaging, "are a distinctive *element of the trade dress.*" (*Id.* ¶47) (emphasis added).

Thus as discussed, the Court construes Chartwell's asserted trade dress as the seven listed elements in combination. (*Id.*)

### 2. Other Elements of the Claim

In addition to identifying its trade dress, a plaintiff must also allege infringement—"(1) its trade dress is 'inherently distinctive' or has acquired 'secondary meaning'; (2) the similarity of the defendant's trade dress to that of the plaintiff creates a 'likelihood of confusion' on the part of consumers; and (3) the plaintiff's trade dress is 'non-functional.'" *Computer Care v. Serv. Sys. Enterprises,*

---

[3] *See also Groeneveld Transp. Efficiency, Inc. v. Lubecore Int'l, Inc.*, 730 F.3d 494, 511 (6th Cir. 2013) ("[plaintiff's] argument fails to appreciate that trademark law does not prohibit *copying* as such; that is the province of copyrights and patents."). Similarly, Chartwell's reference to Defendants copying its "entire business model" (Compl. ¶ 81) does not appear to be based in any particular Lanham Act cause of action.

*Inc.*, 982 F.2d 1063, 1067-68 (7th Cir. 1992) (internal citations omitted). Chartwell pleads all of these elements. (Compl. ¶ 104).

A trade dress is inherently distinctive if it is "sufficiently distinctive to allow consumers to identify the product from the trade dress." *Computer Care*, 982 F.2d at 1069 (internal citation omitted). It acquires secondary meaning if there is "a mental association in buyers' minds between the alleged mark and a single source of the product." *Packman v. Chicago Tribune Co.*, 267 F.3d 628, 641 (7th Cir. 2001) (internal citation omitted). *See also Weber-Stephen Prod.*, 2013 WL 5782433, at *5, n. 4 (analysis of secondary meaning and likelihood of confusion similar at motion to dismiss stage).

Chartwell alleges that consumers recognize its products because of their distinctive logos, coloring, and packaging. (Compl. ¶¶ 49, 104). Chartwell further alleges that Peel People uses similar trade dress, and that similarity makes consumers likely to confuse products of the two companies. (*Id.* ¶ 105). Chartwell asserts that confusion has been created because of how the products are displayed in the store and because key industry influencers confuse the products. (*Id.* ¶¶ 84, 87, 104). Chartwell's images also show the comparison between its trade dress and Peel People's trade dress. (Exhs. 1-2 to Compl.).

To argue that Chartwell has not sufficiently pled its trade dress claim, Defendants focus on the individual elements of the trade dress. But courts consider the total image created by the trade dress elements in combination. *See Bodum USA, Inc. v. A Top New Casting Inc.,* 927 F.3d 486, 492 (7th Cir. 2019) ("where plaintiff seeks to

protect overall appearance of its trade dress, focus of analysis is on that total appearance rather than individual design elements in isolation.") (citation omitted). Defendants' other arguments about the use of the trade dress, whether the brand influencer's video or Dollar Tree's display shows actual confusion, and about other manufacturers using similar trade dress, go to the merits, not whether Chartwell has adequately pled its claim.

Finally, Chartwell alleges that its alleged trade dress is not functional. (Compl. ¶ 104).[4] It is plausible to infer from both the description of the trade dress (as identified in this order) and the photographs attached to the Complaint that the trade dress is decorative instead of functional. And because "[f]unctionality is a factual question" (*Arlington Specialties, Inc. v. Urban Aid, Inc.,* 847 F.3d 415, 419 (7th Cir. 2017)), the Court need not probe further at this stage.

Therefore, Chartwell's trade dress infringement claim, as construed by the Court, survives the motion to dismiss.

### B. Consumer Fraud and Deceptive Business Practices Act (Count II)

Chartwell claims that Defendants violated the Illinois Consumer Fraud and Deceptive Business Practices Act (the "ICFA"), 815 ILCS 505/1 *et seq.*, by lying to Chartwell about their business relationship and manufacturing packaging and products that were essentially identical to those of Chartwell. (Compl. ¶ 113).

---

[4] Chartwell does not plead that its trade dress is federally registered, so it must plead that its trade dress is not functional. 15 U.S.C. § 1125(a)(3). *See Arlington Specialties,* 847 F.3d at 418-19 ("A product feature is functional…if it is essential to the use or purpose of the article or if it affects the cost or quality of the article. [And] it can still be functional if it is a competitive necessity, that is, if its exclusive use would put competitors at a significant non-reputation-related disadvantage.) (internal citations and quotations omitted).

Defendants contend that Chartwell's ICFA claim is time-barred. (Dkt. 18 at 10-11). "While complaints typically do not address affirmative defenses, the statute of limitations may be raised in a motion to dismiss if the allegations of the complaint itself set forth everything necessary to satisfy the affirmative defense." *Brooks v. Ross*, 578 F.3d 574, 579 (7th Cir. 2009) (internal citation and quotation omitted). The statute of limitations for an ICFA action is three years and begins to run when the cause of action accrues. 815 ILCS 505/10a(e).

Chartwell fails to respond to Defendants' argument that its ICFA claim is time-barred. (Dkt. 22). This constitutes waiver. *Alioto v. Town of Lisbon*, 651 F.3d 715, 721 (7th Cir. 2011) ("We apply [the waiver] rule where a party fails to develop arguments related to a discrete issue, and…where a litigant effectively abandons the litigation by not responding to alleged deficiencies in a motion to dismiss…If [judges] are given plausible reasons for dismissing a complaint, they are not going to do the plaintiff's research and try to discover whether there might be something to say against the defendants' reasoning.") (internal citations omitted). *See also Aberman v. Bd. of Educ. of City of Chicago*, 2014 WL 4912139, at *2 (N.D. Ill. Sept. 30, 2014) (dismissing plaintiff's claim when she did not respond to defendant's statute of limitations argument as to that claim).

An additional reason the ICFA claim fails is that the Complaint alleges harm only to Chartwell (Compl. ¶¶ 99-102, 117), "and thus seeks a remedy to address a wrong of a private party, not consumers at large." *Stereo Optical Co. v. Judy,* 2008 WL 4185689, at *5 (N.D. Ill. Sept. 8, 2008); *Bradley v. Direct Auto Ins. Co.*, 2020 IL App

12

(2d) 190426-U, ¶ 61 ("claims under the Consumer Fraud Act must satisfy a 'consumer nexus test,' under which the alleged conduct must involve trade practices addressed to the market generally or otherwise implicate consumer protection rights."). Chartwell's ICFA claim is dismissed with prejudice.

### C. Illinois Trade Secrets Act (Count III)

Chartwell alleges that Defendants misappropriated its trade secrets in violation of the Illinois Trade Secrets Act (the "ITSA"), 765 ILCS 1065/1 *et seq.* (Compl. ¶ 118-27). Defendants argue that this claim is time-barred. (Dkt. 18 at 12). Under the ITSA, an action for misappropriation must be brought within five years after the misappropriation is discovered or by the exercise of reasonable diligence should have been discovered. 765 ILCS 1065/7. *See also Maxtech Consumer Prod., Ltd. v. Robert Bosch Tool Corp.*, 255 F. Supp. 3d 833, 850 (N.D. Ill. 2017) ("[T]he action must be brought within five years after the plaintiff had either actual or constructive notice of the defendant's alleged misappropriation.").

The Complaint in this case was filed on October 22, 2019. (Dkt. 1). If Chartwell had actual or constructive notice of the alleged misappropriation before October 22, 2014, its claim would be time-barred. Chartwell alleges that despite learning in June 2014 of Defendants' business relationship, Chartwell was reassured by Team Impressions repeatedly that it was not sharing Chartwell's proprietary information, including with Peel People. (Compl. ¶¶ 42, 56-57). Thus Chartwell argues that the statute of limitations did not start running until 2018, when it actually discovered Defendants were using information and designs stolen from Chartwell and when Peel

People started displaying its allegedly infringing products in Dollar Tree. (*Id.* ¶¶2-6, 63; Dkt. 22 at 8-9). Drawing all permissible inferences in Chartwell's favor, it is plausible that Chartwell's misappropriation claim did not start accruing until 2018. The Court therefore cannot find at this stage that the ITSA claim is barred. *See Sidney Hillman Health Ctr. of Rochester v. Abbott Labs., Inc.,* 782 F.3d 922, 928 (7th Cir. 2015) ("As long as there is a conceivable set of facts, consistent with the complaint, that would defeat a statute-of-limitations defense, questions of timeliness are left for summary judgment (or ultimately trial), at which point the district court may determine compliance with the statute of limitations based on a more complete factual record.").[5]

Turning to the elements of the claim, a plaintiff claiming misappropriation must allege: "(1) a trade secret existed; (2) the trade secret was misappropriated; and (3) the owner of the trade secret was damaged by the misappropriation." *Liebert Corp. v. Mazur*, 827 N.E.2d 909, 925 (Ill. 2005) (internal citation omitted). A trade secret is information that: "(1) is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality." 765 ILCS 1065/2(d). Misappropriation can be shown by "improper acquisition, unauthorized disclosure, or unauthorized use." *Liebert*, 827 N.E.2d at 925.

---

[5] Because of this finding, the Court need not address Chartwell's equitable estoppel argument. (Dkt. 22 at 9-10).

Chartwell sufficiently pleads misappropriation of trade secrets. It claims trade secrets in the pricing models, production files, designs, specific product specifications and technical components of its decals, and other key elements of its trade dress. (Compl. ¶ 121). The trade secrets also include the "optimized and proprietary marriage of compatible paper backing materials, print surfaces of film and foil, metallic inks, and specialized adhesives and glues" that was developed by its in-house team of printing specialists and technicians. (*Id.* ¶ 91). Such information is allegedly economically valuable because it allows Chartwell to solicit business at preferred price margins and Chartwell incurred significant costs in developing its product specifications. By contrast, Defendants were allegedly able to match and undercut Chartwell's price without investing the same amount of resources in research and development. (*Id.* ¶¶ 123-25).

Chartwell also alleges that it protects its information with a secure password and administrator protected storage files, develops its printing materials in secret, and only supplies such materials to manufacturers on an as-needed basis. (*Id.* ¶ 126). Chartwell further alleges that Team Impressions acknowledged that Chartwell shared the proprietary information with it on a confidential basis, but Team Impressions still shared the information with Peel People. (*Id.* ¶¶ 40-41, 74-75, 96). Finally, Chartwell claims that the misconduct of Team Impressions and Peel People caused it to suffer great losses and face significant difficulties in the market. (*Id.* ¶¶ 12, 101).

15

Defendants contend that the information does not constitute trade secrets in part because Chartwell does not allege to have entered into any nondisclosure or confidentiality agreement with Team Impressions. (Dkt. 18 at 12). However, Chartwell has identified several measures it used to protect its confidential information. (Compl. ¶ 126). The extent of those measures and whether they were reasonable is a question for a later stage of the litigation. Defendants' reliance on *Applied Industrial Materials Corp. v. Brantjes*, 891 F. Supp. 432, 438 (N.D. Ill. 1994), is not convincing as that case was decided on a motion for preliminary injunction, and the Court found that the price information at issue was freely disclosed to "anyone." *Id.* at 432. The Complaint here does not allege that Chartwell's pricing models were publicly or widely available, and whether Chartwell in fact took adequate measures to protect its pricing information requires a more fulsome record.

Accordingly, Chartwell's ITSA claim is adequately pled.

### D. Fraudulent Misrepresentation (Count IV)

Chartwell alleges that Team Impressions made fraudulent misrepresentations about its relationship with Peel People, and Chartwell relied on those representations to continue doing business with Team Impressions and suffered damage as a result. (Compl. ¶¶ 132-42). To state a claim of fraudulent misrepresentation under Illinois law, a plaintiff must allege: "(1) a false statement of material fact; (2) known or believed to be false by the person making it; (3) an intent to induce the plaintiff to act; (4) action by the plaintiff in justifiable reliance on the truth of the statement; and (5) damage to the plaintiff resulting from such reliance." *Doe v. Dilling*, 888 N.E.2d 24,

35-36 (Ill. 2008). Chartwell does not dispute that Rule 9 applies to its claim of fraudulent misrepresentation. Fed. R. Civ. P. 9(b).

The Complaint identifies two specific instances of Team Impressions making false statements: (1) in the June 2014 email when Team Impressions stated it was only a manufacturer and had no control over the products (Compl. ¶ 134, Exh. 4); and (2) in a January 2018 email when Team Impressions stated it does not manufacture "product for Dollar Wall Décor Decals, as we did not want competition for Chartwell." (*Id.* ¶ 135, Exh. 8).

As to the June 2014 email, Chartwell does not explain how the statement that Team Impressions was a manufacturer and did not control the products was materially false. In that same email, Team Impressions expressly admitted to having a business relationship with Peel People, and that when Peel People wanted "to try and run a similar product to the Dollar Tree product, we can't very well say no…did [Peel People] copy some other things too, yes, but the product is at Dollar Tree, anyone can copy the product." (Compl., Exh. 4). Reading the email as a whole does not show that Team Impressions made a false statement of material fact. *See Toulon v. Cont'l Cas. Co.*, 877 F.3d 725, 736 (7th Cir. 2017) ("[plaintiff] has not identified any explicit, false statements of material fact to satisfy the first element for a claim of fraudulent misrepresentation."). The Complaint generally refers to other statements Team Impressions made from 2014 to 2018, but does not point to any specific statement, the speaker, or any other circumstances and thus cannot meet the heightened pleading standard of Rule 9.

17

As to the January 2018 email, Chartwell does not explain how it relied on this statement. It alleges that Team Impressions intended to induce it to continue to do business with it. But the Complaint is clear that Chartwell *ended* its relationship with Team Impressions around that exact time. Thus Chartwell fails to plead that it relied on the January 2018 email to its detriment.

Chartwell's fraudulent representation claim is dismissed without prejudice.

### E. Tortious Interference with Business Relationships (Count V)

Chartwell alleges that Defendants tortiously interfered with its business relationship with Dollar Tree by (1) selling products to Dollar Trees similar to Chartwell's; (2) manufacturing products that infringed on Chartwell products; (3) misappropriating Chartwell's technical specifications and production files; and (4) misappropriating Chartwell's pricing data. (Compl. ¶¶ 143-50).

Defendants argue that Chartwell's claims are preempted by federal law[6] and by ITSA. (Dkt. 18 at 14). The Court agrees that the portion of Chartwell's claim based on misappropriation is preempted by ITSA. ITSA "abolishes claims other than those based on contract arising from misappropriated trade secrets, replacing them with claims under the Act itself." *Hecny Transp., Inc. v. Chu*, 430 F.3d 402, 404 (7th Cir. 2005). Here, Chartwell's allegations in Count V that Defendants "misappropriate[ed] Chartwell's technical specifications and [] its production files" and pricing data

---

[6] Because of Defendants' citation to *FASA Corp. v. Playmates Toys, Inc.*, 869 F. Supp. 1334 (N.D. Ill. 1994), presumably Defendants are relying on 17 U.S.C. § 301(a) of the Copyright Act. But Defendants do not actually cite any particular federal law and do not otherwise develop this argument. *See Alioto*, 651 F.3d at 721; *Jordan v. Binns*, 712 F.3d 1123, 1134 (7th Cir. 2013) (underdeveloped arguments waived). And in any event, there is no claim of copyright infringement in this case.

(Compl. ¶ 148) restates Chartwell's claims in Count III. *See Stereo Optical Co.*, 2008 WL 4185689, at *4 (holding that a claim, though pled as unjust enrichment, was preempted by the ITSA because it was based on alleged misappropriation of trade secrets).

However Count V is not based entirely on misappropriation. Chartwell also alleges that Defendants intended to work together to compete with Chartwell, to infringe on and replace Chartwell's products at Dollar Tree, and to interfere with its long-standing business relationship with Dollar Tree. *See Xpo Logistics, Inc. v. Best Dedicated Sols., Ltd. Liab. Co.*, 2017 U.S. Dist. LEXIS 151317, at *8 (N.D. Ill. Sep. 18, 2017) ("[plaintiff's] tortious interference claim also 'seek[s] recovery for wrongs beyond the mere misappropriation' of trade secret or confidential information."). Tortious interference with business relationships under Illinois law requires: "(1) the existence of a valid and enforceable contract between the plaintiff and another; (2) the defendant's awareness of this contractual relation; (3) the defendant's intentional and unjustified inducement of a breach of the contract; (4) a subsequent breach by the other, caused by the defendant's wrongful conduct; and (5) damages." *Am. Guardian Warranty Servs., Inc. v. Auto. Prot. Corp., Inc.*, 2019 WL 6130813, at *3 (N.D. Ill. Nov. 19, 2019) (citing Illinois law).

Chartwell plausibly pleads a tortious interference claim against Defendants. It had a long-standing business relationship with Dollar Tree, of which Team Impressions had actual knowledge. (Compl. ¶¶143-50). Chartwell alleges that Peel People knew of its business relationship with Dollar Tree and that Team Impressions

19

intentionally teamed with Peel People to produce products that looked similar to Chartwell products. (*Id.* ¶¶ 51-52). Peel People started selling to Dollar Tree with products that looked similar to Chartwell's and became Dollar Tree's supplier of choice for the products. (*Id.* ¶¶ 63-64).

Defendants respond that they were lawfully entitled to compete with Chartwell for Dollar Tree business after Chartwell terminated its relationship with Team Impressions. (Dkt. 24 at 15). That is an argument for another day. The fact that Chartwell and Team Impressions ended their business relationship does not make it implausible that Defendants interfered with Chartwell's relationship with Dollar Tree.

### F. Conspiracy to Tortiously Interfere with Business Relationships (Count VI)

Chartwell alleges that Team Impressions and Peel People conspired to interfere with its business relationship with Dollar Tree by diverting business from Dollar Tree to Peel People. (Compl. ¶¶ 151-59). It is well-settled, however, that "a conspiracy claim alleging a tort as the underlying wrongful act is duplicative where the underlying tort has been pled." *Thermodyne Food Serv. Prods. v. McDonald's Corp.*, 940 F. Supp. 1300, 1310 (N.D. Ill. 1996). *See also Am. Transp. Grp., LLC v. Power*, 2018 WL 1993204, at *6 (N.D. Ill. Apr. 27, 2018) (claim for conspiracy to tortiously interfere with business relationships that did not contain any fact not already presented in the underlying tortious interference claims and was not actionable as a separate claim).

Count VI is duplicative of Chartwell's tortious interference claim and not separately actionable.

## IV. Conclusion

For the stated reasons, Defendants Team Impressions and Peel People's Motion to Dismiss [18] is granted in part and denied in part. Count II (ICFA), Count IV (fraudulent misrepresentation), and Count VI (conspiracy to tortiously interfere) are dismissed. Count IV is dismissed without prejudice, Counts II and VI are dismissed with prejudice. The following counts remain pending: Count I (trade dress infringement, as modified by the Court); Count III (ITSA); and Count V (tortious interference, to the extent it is not based on misappropriation of trade secrets).

MIDP disclosures are due 30 days following the date of this order. Parties' joint written status report must be filed on or before September 14, 2020.

E N T E R:

Dated: July 20, 2020

_____
MARY M. ROWLAND
United States District Judge