IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CHARTWELL STUDIO, INC.,

Plaintiff,

v.

TEAM IMPRESSIONS, INC. and
THE PEEL PEOPLE, LLC,

Defendants.

Case No. 19-cv-06944

Judge Mary M. Rowland

## MEMORANDUM OPINION AND ORDER

Plaintiff Chartwell Studio, Inc. alleges that Defendants Team Impressions, Inc. and the Peel People, LLC infringed its trade dress, misappropriated its trade secrets and interfered with its relationship with the Dollar Tree Store. Before the Court are cross motions for summary judgment and three *Daubert* motions. For the reasons stated below, Defendants' motion to bar expert Mark Partridge [87] is denied in large part, Defendants' motion to bar expert David Duski [88] is denied in large part, Chartwell's motion to bar expert Sarah Butler [92] is denied, Defendants' motion for summary judgment [85, 86] is granted in part and denied in part, and Plaintiff's motion for partial summary judgment [89, 91] is denied.

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine dispute as to any material fact exists if "the evidence is such that a

reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The substantive law controls which facts are material. *Id*. After a "properly supported motion for summary judgment is made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'" *Id*. at 250 (quoting Fed. R. Civ. P. 56(e)).

The Court "consider[s] all of the evidence in the record in the light most favorable to the non-moving party, and [ ] draw[s] all reasonable inferences from that evidence in favor of the party opposing summary judgment." *Logan v. City of Chicago*, 4 F.4th 529, 536 (7th Cir. 2021) (quotation omitted). The Court "must refrain from making credibility determinations or weighing evidence." *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 467 (7th Cir. 2020) (citing *Anderson*, 477 U.S. at 255). In ruling on summary judgment, the Court gives the non-moving party "the benefit of reasonable inferences from the evidence, but not speculative inferences in [its] favor." *White v. City of Chicago*, 829 F.3d 837, 841 (7th Cir. 2016) (internal citations omitted). "The controlling question is whether a reasonable trier of fact could find in favor of the non-moving party on the evidence submitted in support of and opposition to the motion for summary judgment." *Id.*

On cross motions for summary judgment, the Court draws all reasonable inferences in favor of "the party against whom the motion at issue was made." *Woodring v. Jackson Cty. Ind.*, 986 F.3d 979, 984 (7th Cir. 2021) (quotations and internal citation omitted). *See also First State Bank of Monticello v. Ohio Cas. Ins. Co.*, 555 F.3d 564, 567 (7th Cir. 2009) (on cross-motions for summary judgment the

court "construe[s] all facts and inferences therefrom in favor of the party against whom the motion under consideration is made.") (internal quotation marks omitted).

## BACKGROUND[1]

Plaintiff Chartwell is an Illinois corporation that was formed in 2002 and is wholly owned by Neil McCallum. DSOF ¶ 3. Neil's mother, Jan McCallum, was founder of Chartwell and also previously a consultant for Team Impressions, Inc. (Team). *Id.* Since at least 2005, Chartwell has sold printed peel and stick wall décor decals under the brand name Main Street Wall Creations. PSOAF ¶ 1. From its founding until 2017, Chartwell used Team to print certain wall décor products sold at Dollar Tree. *Id.* Team is a corporation that manufactures sticker products including wall décor sticker products. DSOF ¶ 1. The Peel People, LLC (TPP), a Delaware limited liability company, sells peel and stick items, including wall décor, to consumer retailers and value stores. *Id.* ¶ 2. Team manufactures all of the items sold by TPP. *Id.*

Chartwell has registered trademarks for its "Wall:Wear", "Scamper Studio" and "Main Street" brands; this lawsuit addresses only Chartwell's sale of "Main Street" wall décor products sold to Dollar Tree. DSOF ¶¶ 4, 5. Chartwell had no written agreement with Dollar Tree other than purchase orders, and Dollar Tree could cease issuing any purchase orders at any time. *Id.* Wall decor are generally wall safe, removable and repositionable stickers. *Id.* ¶ 7. Wall décor products have historically been printed on either paper (the "Paper Product") or a clear film. *Id.* Chartwell's

---

[1] The facts in this background section are taken from the parties' Rule 56.1 statements and are undisputed unless otherwise noted.

product does not contain any outer packaging (no bag, box, etc.), and is sold primarily at Dollar Tree retail stores, where it hangs in customized display racks. PSOF ¶ 9.

On December 9, 2003, Team submitted its first budget to Chartwell for Christmas wall decor using an 80#/50# Pressure Sensitive Material manufactured by Wausau Coated. DSOF ¶ 9. These were the first wall decor products manufactured by Team for Chartwell. *Id*. Team manufactured wall décor products for Chartwell from 2004 through September 2017. *Id*. ¶ 11. Team generally used Pressure Sensitive Material purchased from supplier CES Designs, Inc. (CES) for Chartwell's Paper Product (and for the paper wall décor products of numerous other customers). *Id*.[2]

In 2017, Neil McCallum requested price reductions from Team due to price pressure from Dollar Tree, but Team refused. *Id*. ¶ 12. Chartwell's last purchase order for wall decals to Team was dated September 7, 2017. *Id*. On December 22, 2017, Thomas Cipriani, general manager of Team, sent Chartwell an email stating that he was surprised to find Chartwell wall decal product at a Dollar Tree store that had not been manufactured by Team. *Id*. According to Neil McCallum, Chartwell switched from Team to other manufacturers because of pricing pressure from the buying group at Dollar Tree. *Id*. At the end of 2017, Cipriani told Mark Meccia (one of the TPP owners) that Chartwell was no longer a customer of Team Impressions, and at that point, Defendants determined to go after Chartwell's business at Dollar Tree. PSOF ¶ 32. In 2018, TPP sold six SKUs of wall decal products consisting of

---

[2] Team began manufacturing wall decor products in 2001 for customers. *Id*. ¶ 44. Prior to manufacturing any wall decor products for Chartwell, Team manufactured wall decor products for a number of other customers, including wall decor products manufactured with an 80-pound semi-gloss paper and a 50-pound liner with a removable adhesive. *Id*.

515,000 units to Dollar Tree for a total of $164,800. DSOF ¶ 13. Throughout the duration of the business relationship between Team and Chartwell, Mr. Cipriani never told Jan or Neil McCallum that he had an ownership stake in TPP, though he disclosed that relationship with TPP to numerous other customers. PSOAF ¶ 17.

Chartwell claims a protected trade dress in its "Main Street" brand product, consisting of a combination of seven elements. DSOF ¶ 15. Since at least 2017, along with Chartwell's Main Street Creations wall décor, the same wall décor racks at Dollar Tree stores contained wall decals branded #1 Dollar Decorators and York Wallcoverings. *Id*. ¶ 16. Dollar Tree regularly brings in competitors of existing suppliers to reduce the price on an existing program with the incumbent supplier. *Id*. ¶ 30. Dollar Tree bought Family Dollar chain of stores in 2014 or 2015. *Id*. ¶ 66. In 2018, both TPP and Chartwell competed for the Family Dollar wall decor business. *Id*. The Family Dollar buyer put pressure on Chartwell for lower prices. *Id*. TPP ultimately won the wall decor business at Family Dollar. *Id*.

In this case, Chartwell's remaining claims against Defendants are: trade dress infringement (Count I), violation of the Illinois Trade Secrets Act (Count III), and tortious interference (Count V).[3] The Court begins below with the *Daubert* motions and then addresses Chartwell's claims.

---

[3] The Court dismissed Chartwell's other claims on July 20, 2020 (Dkt. 39) and denied Chartwell's motion for leave to file an amended complaint on November 17, 2021. (Dkt. 70).

## ANALYSIS

### I.  *Daubert* Motions

Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) govern the admissibility of expert testimony. Expert testimony is admissible under Rule 702 if technical or specialized knowledge "will assist the trier of fact to understand the evidence or to determine a fact in issue." The Court assesses (1) whether the witness is qualified; (2) whether the expert's methodology is scientifically reliable; and (3) whether the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue. *Myers v. Ill. Cent. R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010). District courts act as gatekeepers and must ensure that expert testimony "is not only relevant, but reliable." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999) (quotation omitted). Relevant factors in this determination include testing, peer review, error rates, and acceptance by the relevant expert community. *See Daubert*, 509 U.S. at 593–94. The reliability inquiry is flexible, however, and not all of these factors will apply in every case. *See Kumho*, 526 U.S. at 141.

In assessing the admissibility of expert opinions, courts do not focus on "the ultimate correctness of the expert's conclusions," *Schultz v. Akzo Nobel Paints, LLC*, 721 F.3d 426, 431 (7th Cir. 2013), but "solely on principles and methodology," *Daubert*, 509 U.S. at 595. The "soundness of the factual underpinnings" and "correctness of the expert's conclusions" may affect any ultimate determination on the merits, but do not govern admissibility. *Smith v. Ford Motor Co.*, 215 F.3d 713,

718–19 (7th Cir. 2000). The expert must explain his or her methodology and cannot "simply assert a bottom line." *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 761 (7th Cir. 2010) (internal quotation marks and citation omitted). Finally, the expert "may be qualified by 'knowledge, skill, experience, training, or education.'" *Smith*, 215 F.3d at 718 (quoting Fed. R. Evid. 702). District courts have "great latitude in determining not only *how* to measure the reliability of the proposed expert testimony but also whether the testimony is, in fact, reliable." *United States v. Pansier*, 576 F.3d 726, 737 (7th Cir. 2009).

### a. Mark Partridge

Defendants move to bar the opinions, report, and testimony of Chartwell's expert Mark Partridge. Partridge is a lawyer and a partner at a law firm where he practices in several of its groups, including intellectual property, IP litigation, and trademarks and brand protection. (Patridge Rep. (Dkt. 87, Exh. A)). Partridge opined, in sum, that: (1) given the arbitrary nature of a number of elements comprising Chartwell's trade dress packaging, Chartwell's trade dress is inherently distinctive; (2) Chartwell's trade dress is also protectable based on acquired secondary meaning; and (3) Chartwell is likely to suffer harm due to a likelihood of consumer confusion, mistake or deception caused by Defendant's trade dress. (*Id*. pp. 21–22). Defendants argue that (1) Partridge is not qualified to offer his opinions; (2) his conclusions have previously been dismissed; (3) he did not employ a reliable methodology; (4) he did not rely on sufficient facts or data and (5) his opinions will not assist the trier of fact.

The Court begins with Partridge's qualifications. Defendants contend that Partridge's experience as a trademark lawyer does not give him particularized knowledge about the perceptions of an ordinary consumer in the dollar store wall décor market or a basis to opine about distinctiveness, secondary meaning or consumer confusion in this case. To determine if an expert is qualified, the Court looks at "each of the conclusions he draws individually to see if he has the adequate education, skill, and training to reach them." *Gayton v. McCoy*, 593 F.3d 610, 617 (7th Cir. 2010). At the same time, "[o]rdinarily, courts impose no requirement that an expert be a specialist in a given field." *Hall v. Flannery*, 840 F.3d 922, 929 (7th Cir. 2016) (alteration in original) (quoting *Gayton*, 593 F.3d at 617).[4] In addition to Partridge's forty years of experience as an intellectual property lawyer, he advises companies on consumer marketing issues and the development and protection of trademarks and trade dress. (Patridge Rep. ¶ 13; Partridge Dep. (Dkt. 87, Exh. B) pp. 13–14, 20–21). Specifically, Partridge has:

> been retained frequently by sophisticated consumer product companies to advise on the likelihood of confusion, mistake or deception arising from the use of various trademarks and packaging designs in the marketplace, and [his] advice has been relied upon by such companies to make decisions involve large advertising and marketing expenditures.

(Patridge Rep. ¶ 13). His CV also shows that he has written articles and given speeches on trade dress. *Id.* Exh. A. Given his extensive specialized legal experience as well as his experience advising companies about likelihood of confusion, packaging and advertising, the Court finds Partridge qualified to give his opinions. *See Kumho*

---

[4] Defendants rely only on non-binding, out-of-circuit cases.

*Tire Co.*, 526 U.S. at 156 (expert can draw conclusions from observations based on extensive and specialized experience).[5]

Next, Defendants argue that Partridge's legal conclusions have previously been dismissed, relying on a single out-of-circuit case that is not binding on this Court. (Dkt. 87 at 5). In that case, no *Daubert* motion was filed and the court there was concerned that there was no explanation of who Partridge was or his methodology, and found he merely gave a legal opinion. *Id*. Not so here. This Court has before it a fully briefed *Daubert* motion along with numerous exhibits including Partridge's report and deposition.

Defendants further argue that Partridge failed to employ any reliable methodology because he merely did a "personal comparison" of Chartwell's trade dress with TPP's trade dress. (Dkt. 87 at 9). According to Defendants, the Court should disregard Partridge's opinions because, unlike Defendants' expert, he did not conduct a consumer survey. Partridge explained that to arrive at his opinions, he considered information from a variety of sources and relied on his professional judgment, experience and expertise from many years analyzing relevant issues. (Patridge Rep. ¶ 15). The fact that Partridge did not conduct a survey impacts the weight of his testimony, not its admissibility. *See United States v. Protho*, 41 F.4th 812, 821 (7th Cir. 2022), *cert. denied*, 143 S. Ct. 465 (2022) (explaining that the flexibility in the *Daubert* inquiry gives district courts "broad latitude" to decide both

---

[5] Defendants concede that, although Partridge did not conduct one in this case, he has experience with surveys: he "regularly design[s] and conduct[s] consumer surveys". (Dkt. 99 at 2).

"how to determine reliability" and "the ultimate reliability determination."). Defendant does not cite controlling authority that an expert in a trade dress case must conduct a consumer survey to avoid exclusion under *Daubert*. Indeed a consumer survey is only one way of establishing secondary meaning. *See Thomas & Betts Corp. v. Panduit Corp.*, 138 F.3d 277, 291 (7th Cir. 1998) (noting that secondary meaning can be established "through direct consumer testimony, consumer surveys, length and manner of use, amount and manner of advertising, volume of sales, place in the market and proof of intentional copying") (quotation omitted); *Uncommon, LLC v. Spigen, Inc.*, 926 F.3d 409, 424 (7th Cir. 2019) (explaining the "many ways to prove a secondary meaning or lack thereof," of which a consumer survey constitutes one of the more "helpful" means) (quotation omitted).

Defendants next argue that Partridge did not rely on sufficient facts and data. They contend for example that he did not have sufficient support for his statement about Chartwell using the same trade dress back to the early 2000s and that he relied on "cherry-picked" information and on misinterpretations of other witness depositions. Again, while Defendants remain free to cross-examine Partridge on these perceived deficiencies, they do not require Partridge's exclusion under *Daubert*. *See Manpower, Inc. v. Ins. Co. of Pa.*, 732 F.3d 796, 806 (7th Cir. 2013); *United States v. Mikos*, 539 F.3d 706, 711 (7th Cir. 2008) (instructing that Rule 702 "does not condition admissibility on . . . a complete and flaw-free set of data."); *Smith*, 215 F.3d at 718–19 (explaining that admissibility not determined by the "soundness of the factual underpinnings").

10

Finally, the Court does not agree with Defendants that Partridge only offers legal conclusions in his report. While the law prohibits experts from offering ultimate legal conclusions, *see Good Shepherd Manor Found., Inc. v. City of Momence*, 323 F.3d 557, 564 (7th Cir. 2003), "experts with the proper legal background . . . may offer ['legal'] testimony." *In re Ocean Bank*, 481 F. Supp. 2d 892, 898 (N.D. Ill. 2007). "There is a difference between stating a legal conclusion and providing concrete information against which to measure abstract legal concepts." *United States v. Blount*, 502 F.3d 674, 680 (7th Cir. 2007). Partridge does the latter. His opinions recite and incorporate legal concepts but he stops short of rendering an ultimate legal opinion that Defendants infringe Chartwell's trade dress.

However, the Court agrees with Defendants that Partridge's opinion about inherent distinctiveness is an unsupported legal conclusion. *See Donahue v. Barnhart*, 279 F.3d 441, 446 (7th Cir. 2002) (explaining that expert can "give a bottom line, provided that the underlying data and reasoning are available on demand."). Partridge's opinion on this issue is total of two paragraphs, and only one paragraph addresses Chartwell's trade dress. (Partridge Report at 6). He merely states that this trade dress "is comprised of many arbitrary elements, placed so that consumers can identify the source of the product." *Id*. No further explanation or basis for this opinion is given, such as what the elements are, which elements are arbitrary and why, and

11

why their placement allows consumers to identify the source of the product.[6] The Court excludes Partridge's opinion about inherent distinctiveness.

For these reasons, Defendants' motion to bar expert Mark Partridge [87] is denied in large part.

### b. Sarah Butler

Chartwell moves to bar Defendants' expert Sarah Butler. Butler is a Managing Director at NERA Economic Consulting, where she is the Chair of the Survey and Sampling Practice and a member of the Intellectual Property, Product Liability, Antitrust, and Labor Practices. (Butler Rep. (Dkt. 92-1)). Butler conducted a consumer survey that asked 419 respondents to examine a wall decal product from Chartwell Studio's Main Street Wall Creations brand (or the Control Product). (*Id*. ¶ 9). Her survey demonstrated that relevant consumers do not associate the specific claimed trade dress elements of Chartwell's wall décor decals with the look and design of a single source. *Id*. ¶ 10. She explained that "[her] conclusions have been reached through the proper application of survey methods, and using standard methodologies relied upon by experts in the field of survey and market and consumer research." *Id*. ¶ 59. Chartwell is not challenging Butler's qualifications, the survey's universe of respondents, or method of collecting responses.

Chartwell argues, however, that Butler's survey was "so flawed" that it renders her analysis irrelevant and unhelpful to the trier of fact. (Dkt. 92 at 1). Chartwell

---

[6] Moreover, in Plaintiff's response brief [102], Plaintiff fails to address this argument by Defendant, resulting in waiver. *See Shipley v. Chi. Bd. of Election Comm'rs*, 947 F.3d 1056, 1062–63 (7th Cir. 2020); *Bonte v. U.S. Bank N.A.*, 624 F.3d 461, 466 (7th Cir. 2010).

retained rebuttal expert Hal Poret who identified a number of flaws in Butler's report. According to Poret, Butler's survey was flawed because she asked respondents about their association with respect to the product *decal*, not the product packaging overall. Chartwell thus contends that "Butler drew respondents' attention to something she acknowledges is not actually part of Chartwell's claimed trade dress." (Dkt. 92 at 10). Chartwell also argues that the design of the survey failed to properly elicit responses. Defendants counter that Butler's survey "directly tested the alleged secondary meaning of Chartwell's claimed trade dress," and Chartwell draws "a false distinction" between the decal itself and the decal as packaged. (Dkt. 99 at 7, 9).

As the Seventh Circuit has explained, "[w]hile there will be occasions when the proffered survey is so flawed as to be completely unhelpful to the trier of fact and therefore inadmissible, such situations will be rare. . . . [A]ny shortcomings in the survey results go to the proper weight of the survey and should be evaluated by the trier of fact." *AHP Subsidiary Holding Co. v. Stuart Hale Co.*, 1 F.3d 611, 618 (7th Cir. 1993) (internal citation omitted);[7] *see also Uncommon, LLC v. Spigen, Inc.*, 305 F. Supp. 3d 825, 850 (N.D. Ill. 2018) (noting that courts "rarely exclude consumer surveys from evidence"), *aff'd*, 926 F.3d 409 (7th Cir. 2019); *Uncommon, LLC*, 926 F.3d at 417 (remarking that no survey is "foolproof").

In terms of the survey design and question phrasing, the Court does not find the survey so fundamentally flawed to require exclusion. Chartwell's contention that the Butler Survey questions did not adequately focus on the correct issue goes to how

---

[7] *AHP Subsidiary* does not help Chartwell; in that case the Seventh Circuit found that the district court erred in excluding the results of the consumer survey.

much weight the Court should give the survey results. *See McGraw–Edison Co. v. Walt Disney Prods.*, 787 F.2d 1163, 1172 (7th Cir. 1986) (holding that the district court's concern about the "manner of presentation to the interviewee goes to the weight to be accorded to the survey results rather than providing a reason to ignore the survey evidence altogether."); *Bodum USA, Inc. v. A Top New Casting, Inc.*, No. 16 C 2916, 2017 WL 6626018, at *7 (N.D. Ill. Dec. 28, 2017) (explaining that where a particular survey question "could have resulted in sampling bias [ ] goes only to the weight of the survey"). Moreover, as Defendants point out, while Chartwell retained both Partridge and Poret, neither conducted their own consumer survey in this case.

To support its position, Chartwell relies on *Spraying Systems Co. v. Delavan, Inc.*, 975 F. 2d 387 (7th Cir. 1992), where the court of appeals found "serious problems" with the expert's consumer survey including bias in the survey and the fact that the survey was conducted over the phone. *Id.* at 394. The Butler Survey does not have the host of "serious problems" that existed in the *Delavan* survey. The problems Chartwell points out do not rise to the level requiring the Court to ignore the survey results and Butler's testimony. *See Zarinebaf v. Champion Petfoods USA Inc.*, No. 18 C 6951, 2022 WL 910638, at *4 (N.D. Ill. Mar. 29, 2022) ("These types of technical defects and study design choices may lessen the evidentiary weight to be afforded but do not leave the surveys so flawed as to be unreliable or unhelpful to a trier of fact.").

Therefore Chartwell's motion to bar expert Sarah Butler [92] is denied.

### c. David Duski

Defendants move to bar Chartwell's damages expert David Duski. Duski is a Principal at international consulting firm Charles River Associates. (Duski Rep. (Dkt. 88, Exh. A)). Chartwell retained Duski to "prepare analyses to assist the Court and/or jury in considering the amount of damages that may be recoverable by Chartwell should the Defendants be found liable for one or more of the alleged claims." *Id*. p. 3. Duski calculated (1) Chartwell's lost profits from price reductions due to the Defendants' alleged wrongdoing and (2) Defendants' profits earned from sales of their wall décor products to Dollar Tree. *Id*. p. 18. Duski's total damages calculation for Chartwell is $3,204,568. *Id*. The damages fall into these categories: Chartwell's actual loss, TPP's unjust enrichment, Team's unjust enrichment and prejudgment interest.

Defendants argue that Duski is not qualified, his report lacks any reliable methodology, and his opinions will not aid the trier of fact. First, Defendants contend that Duski is not qualified because he has no expertise in trade secret misappropriation or the Lanham Act and no experience in wall décor, the dollar store channel, or with Dollar Tree. As discussed, however, "[o]rdinarily, courts impose no requirement that an expert be a specialist in a given field." *Hall*, 840 F.3d at 929 (quoting *Gayton*, 593 F.3d at 617). Duski is a damages expert, and has provided his consulting services in connection with commercial disputes including those involving trademark and trade dress infringement and trade secret misappropriation. (Duski Rep. p. 1). He has lectured on intellectual property damages in a number of venues

and at his previous consulting firm, he led the national intellectual property consulting practice. *Id*. pp. 1, 2. The Court finds Duski qualified in this case.

Next the Court does not agree that Duski is simply acting as a "mouthpiece" for Chartwell and its witnesses. Duski considered the testimony of both parties' witnesses as well as third party witnesses. (Duski Rep. pp. 3, 4). To calculate Defendants' revenues, Duski relied on and performed his own assessment of Defendants' documents. (*Id*. pp. 47–50). *See In re Sulfuric Acid Antitrust Litig*., 235 F.R.D. 646, 659 (N.D. Ill. 2006) (disagreeing with defendants' objection to expert who relied on data that was from the defendants' own files). To the extent that Defendants believe Duski relied too heavily on Chartwell's witnesses' statements, they can explore that on cross-examination. *See Walker v. Soo Line R.R. Co*., 208 F.3d 581, 589 (7th Cir. 2000) (holding that an expert's reliance on faulty information does not go to admissibility, but rather can be explored on cross-examination).

Defendants argue that Duski cannot give a "causation" opinion. A section of Duski's report is entitled, "Chartwell's Actual Losses Were Proximately Caused by The Defendants' Alleged Wrongdoing." (Duski Rep. p. 25). In that section Duski discusses evidence that establishes the "nexus" between Defendants' "alleged bad acts" and the economic injury. *Id*. However Duski qualifies his discussion by stating: "[b]y engaging in the alleged wrongdoing (which I am required to assume), the Defendants were able to avoid time, costs, and investments similar to those incurred by Chartwell when developing a successful wall décor product line for Dollar Tree." *Id*. p. 39. Earlier in his report he specifies that Chartwell retained him to estimate

damages that "*may* be recoverable by Chartwell *should the Defendants be found liable*" and he is not offering an opinion on liability issues. (*Id*. p.3, emphasis added). For the purpose of calculating damages, an expert can assume liability. *See Elorac, Inc. v. Sanofi-Aventis Canada, Inc.,* No. 14 C 1859, 2017 WL 3592775, at *11 (N.D. Ill. Aug. 21, 2017) ("Nothing prevents a damages expert from making a reasonable assumption in calculating damages."); *Sys. Dev. Integration, LLC v. Computer Scis. Corp.*, 886 F. Supp. 2d 873, 882 (N.D. Ill. 2012) ("It is entirely appropriate for a damages expert to assume liability for the purposes of his or her opinion."). In his report, Duski permissibly assumes liability and bases his damages opinions on that assumption. If he testifies, the Court will not permit Dusky to opine on causation. *See Telebrands Corp. v. My Pillow, Inc.*, No. 18-CV-06318, 2021 WL 4125108, at *5 (N.D. Ill. Sept. 9, 2021) (precluding a damages expert from opining on causation).

Defendants assert other objections to Duski's report: they challenge his decision to extend his damage analysis to December 31, 2022, contend that there is no evidence that TPP's offer of wall décor at 28 cents in 2019 was tied to any infringement of Chartwell's trade dress, and argue he misread certain deposition transcripts. Again these issues do not require exclusion. *See Walker*, 208 F.3d at 589; *see also Zambrano v. Sparkplug Cap., LLC*, No. 19 CV 100, 2022 WL 2657224, at *3 (N.D. Ill. July 8, 2022) ("Defendants' objections challenge the factual underpinnings of [expert's] analysis and the correctness of his conclusions [which] go to weight, not admissibility."). Finally, Duski's report addresses all three claims in this case—his report refers to the three claims collectively as "the alleged wrongdoing." (Duski Rep.

p. 2)). Because the Court is granting summary judgment in Defendants' favor on trade secrets and tortious interference claims, it bars those portions of Duski's report and his testimony addressing those claims specifically.

In sum, Defendants' motion to bar expert David Duski [88] is denied in large part.

## II. Lanham Act Claim (Count I)

Turning to the claims in this case, the parties cross-move for summary judgment on Chartwell's claim for trade dress infringement under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). "It is well established that trade dress can be protected under federal law." *TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 28 (2001). A product's design or packaging "may acquire a distinctiveness which serves to identify the product with its manufacturer or source." *Id.* "[A] design or package which acquires this secondary meaning, assuming other requisites are met, is a trade dress which may not be used in a manner likely to cause confusion as to the origin, sponsorship, or approval of the goods." *Id.*

The parties agree that Chartwell has identified the following seven elements of its alleged trade dress:

> (i) a small header, differentiated in a different, bold color, that states at the top "Peel & Stick"; (ii) a photograph of the Products themselves in use on the right side of the header; (iii) headers in two distinctive, primary colors, depending on the brand – lime green for its Main Street Wall Creations brand and navy blue for its Scamper Studios brand; (iv) transparent packaging that allows for full display of all products; (v) inclusion of a small green dot on the front of the package that says "Think Green" as an indicator of environmental consciousness; (vi) the products themselves, which due to their high visibility, are a distinctive element of the trade dress; and (vii) a backside label that encourages consumers to post and share their creations on Facebook, includes the moniker "Made in the USA," contains application instructions for the

Products, advises that the products are choking hazard, and includes further reproductions of the products.

DSOF ¶ 15. To prove trade dress infringement, Chartwell must show: "(1) its trade dress is inherently distinctive or has acquired secondary meaning; (2) the similarity of the defendant's trade dress to that of the plaintiff creates a likelihood of confusion on the part of consumers; and (3) the plaintiff's trade dress is non-functional." *Computer Care v. Serv. Sys. Enterprises, Inc.*, 982 F.2d 1063, 1067–68 (7th Cir. 1992) (cleaned up). In its motion, Chartwell argues that its evidence establishes that Defendants infringed its trade dress. In their motion, Defendants argue that Chartwell failed to establish secondary meaning or inherent distinctiveness, produce evidence of consumer confusion, and show non-functionality.[8]

### a. Inherent Distinctiveness and Secondary Meaning

First, as discussed, Chartwell's expert Mark Partridge opined that its trade dress is inherently distinctive and also acquired secondary meaning, but the Court excluded his opinion about inherent distinctiveness. Other than relying on Partridge, Chartwell makes conclusory arguments about why its trade dress is inherently distinctive. The evidence it relies on does not identify the alleged arbitrary elements

---

[8] In its opening motion, Defendants asserts that Chartwell's trade dress elements are all functional. (Dkt. 85). Chartwell argues that Defendants waived this affirmative defense. (Dkt. 101 at 3). Indeed, "[w]hile the burden of proving distinctiveness is of course on the plaintiff, some courts, including our own, hold that functionality is an affirmative defense and so the burden of proof rests on the defendant." *Publications Int'l, Ltd. v. Landoll, Inc.*, 164 F.3d 337, 339–40 (7th Cir. 1998). *See also Jay Franco & Sons, Inc. v. Franek*, 615 F.3d 855, 857 (7th Cir. 2010). Defendants did not respond to Chartwell's waiver argument in their reply brief (Dkt. 105). Chartwell raised the same waiver argument in its summary judgment motion (Dkt. 90), and Defendants again did not address the argument in their response (Dkt. 97). The Court finds Defendants' functionality defense waived. *See Bonte*, 624 F.3d at 466 ("Failure to respond to an argument . . . results in waiver.").

of the trade dress, and otherwise Chartwell merely cites its complaint or photographs of the display racks, which do not help Chartwell meet its burden on summary judgment. (Dkt. 91 at 3; Dkt. 90 at 6–7).

Still, Chartwell can offer evidence of inherent distinctiveness *or* secondary meaning. Secondary meaning refers to trade dress that is "uniquely associated with a specific source," and to demonstrate it, it must be shown that "in the minds of the public, the primary significance of the trade dress is to identify the source of the product rather than the product itself." *Weber-Stephen Prod. LLC v. Sears Holding Corp.*, No. 13 C 01686, 2015 WL 5161347, at *4 (N.D. Ill. Sept. 1, 2015) (cleaned up). Secondary meaning can be established through both direct and circumstantial evidence. *Black & Decker Corp. v. Positec USA Inc.*, No. 11-CV-5426, 2015 WL 1543262, at *27 (N.D. Ill. Mar. 31, 2015). The Court finds Chartwell has provided sufficient evidence of secondary meaning to survive summary judgment.

Expert Partridge opined that Chartwell's trade dress acquired secondary meaning and discussed the factors that contributed to his conclusion—length and manner of use, proof of intentional copying, place in the market/advertising/sales, and evidence of recognition of Chartwell's trade dress. (Partridge Report at 27–28). For the reasons explained above, the Court denied Defendants' *Daubert* motion challenging Partridge's opining about secondary meaning. Moreover, Defendants concede that

20

Chartwell's failure to conduct a consumer survey is not fatal to its claim. (Dkt. 85 at 7).[9]

In addition, Chartwell argues that marketing and advertising evidence shows its trade dress acquired secondary meaning. Defendants do not dispute that both their products and Chartwell's are sold for $1.00, and Defendants' products were regularly placed in the same racks at Dollar Tree stores where Chartwell Products were sold, in the racks Chartwell created. (PSOF ¶¶ 7, 14, 42). Expert Partridge explained that Chartwell created a specialized display rack to display its products, and he believed it was an intentional effort by Defendants to have their product end up in the same location and rack. (Partridge Report at 28).

As for consumer testimony, Defendants do not dispute that there is a YouTube video of an industry influencer who confuses wall décor decal products manufactured by Chartwell with those of Defendants. PSOF ¶ 43. Defendants critique Chartwell's reliance on the video based on certain statements and conduct of the influencer in the video. (Dkt. 95 at 13). But at this stage the Court takes reasonable inferences from the evidence in Chartwell's favor, and finds this evidence helps to create an issue of fact about secondary meaning. *See Lovelace v. Gibson*, 21 F.4th 481, 483 (7th Cir. 2021) (on summary judgment, courts construe "all genuine disputes of material fact, along with reasonable inferences from those facts, in favor of [] the nonmovant.").

---

[9] Defendants cite *Toyo Tire Corp. v. Atturo Tire Corp.*, No. 14-cv-00206, 2021 U.S. Dist. LEXIS 24543 (N.D. Ill. Feb. 9, 2021), but there were several distinguishing factors in that case including that there was no rebuttal expert report at all, and the Court excluded plaintiff's secondary meaning experts. Here, there are competing expert reports on secondary meaning.

Chartwell also argues that there is evidence of copying. Chartwell cites deposition testimony that Meccia (of TPP) had final say on TPP designs, and told Marceli Jasinski, a designer formerly employed by TPP and Team, to "mimic" the competition's headers, in size, image and design. PSOF ¶ 37. Chartwell also cites Cipriani's deposition testimony that the size of TPP's wall décor product sold to Dollar Tree was based on the existing size of Chartwell's product sold to Dollar Tree. *Id.* ¶ 38. Further, Defendants admit that Meccia worked with a third-party sales broker, Waylon Smith, to facilitate a pitch meeting with the Dollar Tree buyer, and that Smith testified that he was trying to leverage Team's prior manufacture of the wall décor decal product for Chartwell in order to sell the same product on behalf of TPP. *Id.* ¶¶ 35, 40. With regard to Jasinski's testimony, Defendants respond that it distinguished the header Jasinski worked on from the Green DIY Décor header. (Dkt. 98 at 10). Whether Chartwell can establish copying at trial remains to be seen. But taking the evidence together with other evidence in the record and drawing all reasonable inferences from the evidence in Chartwell's favor. there are issues of material fact for a jury.

At the same time, summary judgment is not warranted in Chartwell's favor. Defendants have provided an expert report that conflicts with Partridge's report. Expert Butler opined that Chartwell did not establish secondary meaning because, based on her survey results, the "claimed trade dress elements do not cause consumers to associate Chartwell Studio's Main Street Wall Creations wall décor with a single source." (Butler Report at 7). *See Uncommon, LLC*, 926 F.3d at 424

(explaining that to prove a secondary meaning or lack of it, a consumer survey is one of the more helpful means). A reasonable jury could heavily credit Butler's survey and conclusions and find Chartwell did not establish secondary meaning.

In sum, there are factual issues about whether Chartwell's trade dress acquired secondary meaning, precluding summary judgment.

### b. Consumer Confusion

Chartwell argues that the similarity of the two trade dresses creates a likelihood of consumer confusion. This confusion is found in the sales channels, product marketing, use of racks, testimony of Defendants' graphic designer, and a side-by-side comparison of the products. *See Chicago Trib. Co. v. Fox News Network, LLC*, 520 F. Supp. 2d 930, 934 (N.D. Ill. 2007) (noting that courts look at "what happens in the marketplace" and "the two marks side-by-side"). And again, Chartwell points to the video of the industry influencer confusing the two products. PSOF ¶ 43. In addition, Chartwell's expert opined that there is "similarity in design, size and overall commercial impression" between the trade dresses, and based on his experience and assessment, there is a "likelihood of confusion, mistake and deception of relevant consumers." (Partridge Report at 29-30). In short, this is not a case where a plaintiff relies solely on an isolated incident of confusion.

Defendants raise several arguments in response, namely that Chartwell's product "is sold with a header prominently displaying its trademark and tradename 'Main Street Creations', while TPP's header prominently displays the 'DIY' tradename." (Dkt. 97 at 15). But these arguments demonstrate why there are factual issues for a

23

jury to resolve. Indeed generally "[l]ikelihood of confusion is a question of fact." *Door Sys., Inc. v. Pro-Line Door Sys., Inc.*, 83 F.3d 169, 173 (7th Cir. 1996). This is especially true where, as here, there are conflicting expert reports: in contrast to Partridge, Butler opines that "[c]onsumers who do not associate the Chartwell's trade dress with a single source could not be confused by Team Impressions/Peel People's wall decals." (Butler Report at 8). Chartwell has provided sufficient evidence to avoid summary judgment, but summary judgment in Chartwell's favor is also not warranted in light of the evidence and the experts' competing reports.

For these reasons, the parties' cross motions for summary judgment on Chartwell's trade dress claim are denied.

### III.    Misappropriation (Count III)

To prevail on a claim under the Illinois Trade Secrets Act ("ITSA"), 765 Ill. Comp. Stat. 1065/1–1065/9, a plaintiff must demonstrate "that the information at issue was a trade secret, that it was misappropriated and that it was used in the defendant's business." *REXA, Inc. v. Chester*, 42 F.4th 652, 662 (7th Cir. 2022) (quotation omitted), *reh'g denied*, No. 20-2953, 2022 WL 3724306 (7th Cir. Aug. 29, 2022). Chartwell fails to create a genuine issue of material fact on the first two elements, and thus cannot survive summary judgment on its ITSA claim. (A finding that there is no genuine dispute about just one element would also entitle Defendants to summary judgment on this claim. *See id.*).

### 1. *Trade Secret*

The parties dispute whether Chartwell has shown that a trade secret existed in this case. Under the ITSA, a trade secret is information that is "sufficiently secret to derive economic value" and "the subject of efforts that are reasonable under the circumstances to maintain its secrecy." 765 Ill. Comp. Stat. 1065/2(d). "Case law requires a high level of specificity when a plaintiff makes a claim for misappropriation of a trade secret." *REXA, Inc.,* 42 F.4th at 663. When identifying its trade secret, the "key task for a plaintiff is to present a specific element, or combination of elements, that is unknown to the trade and was allegedly misappropriated." *Id*.

Chartwell characterizes its trade secrets as follows[10]:

> (1) the physical paper product itself, which is the proprietary marriage of the face paper, paper backing, the release on the paper backing and an adhesive, and which has certain technical characteristics, and (2) financial data and pricing information, inclusive of its selling price to Dollar Tree.

The first claimed trade secret comprises the face paper, paper backing (or liner) and the release on the paper backing, and an adhesive. (Dkt. 101 at 5).[11] Defendants contend that this material was common in the business and Chartwell did not develop

---

[10] Chartwell says its trade secrets are "described in greater detail in its Complaint." (Dkt. 101 at 5). However at summary judgment Chartwell "can no longer rest on the pleadings" and must submit evidence to meet its burden. *Montano v. City of Chicago*, 535 F.3d 558, 569 (7th Cir. 2008) (quotation omitted).

[11] Chartwell's statement of additional facts refers to the time of adhesion, particular feel and approximate thickness of the material. (PSOAF ¶ 8). It is not clear whether Chartwell is claiming these as additional components or sub-components of its alleged trade secret. Further, Chartwell does not explain how these components were unknown to the trade. In a trade secret case, "a plaintiff must do more than just identify a kind of technology and then invite the court to hunt through the details in search of items meeting the statutory definition." *IDX Sys. Corp. v. Epic Sys. Corp.*, 285 F.3d 581, 584 (7th Cir. 2002).

and does not own the adhesive. Chartwell responds that it need not own or "have granular knowledge of" every sub-component of its trade secret, and some components can be in the public domain. (Dkt. 101 at 11–12). The Court agrees with Defendants that Chartwell has not adduced facts showing that the material was unknown in the industry.

On the contrary, the record shows that another company developed Chartwell's claimed trade secret, and the material became part of Chartwell's product only after being manufactured by one company, sold to a second company, then sold to Team, before reaching Chartwell. Specifically, the record shows that Team used Pressure Sensitive Material—Chartwell's claimed trade secret—which it purchased from CES for Chartwell's Paper Product. DSOF ¶ 42. CES is a sole proprietorship which Homer Coker ("Coker") operates out of his home. *Id*. ¶ 45. The Pressure Sensitive Material consists of an 80-pound semi-gloss paper and a 50-pound liner with a removable adhesive. *Id*. ¶ 42. Coker helped develop this material in 2004, with technical advice from Technicote. *Id*. CES ordered the Pressure Sensitive Material from Technicote and paid for it, and Team ordered the material from, and paid, CES. *Id*. ¶ 46. It is undisputed that Team, before manufacturing any wall decor products for Chartwell, manufactured such products for a number of other customers, "including wall decor products manufactured with an 80-pound semi-gloss paper and a 50- pound liner with a removable adhesive." *Id*. ¶ 44. Chartwell acknowledges that the 50-pound backing is common in the industry, and numerous competitors in the industry produce products similar to Technicote's Pressure Sensitive Material. *Id*. ¶ 47.

The record, which demonstrates that Chartwell received the paper material as a downstream customer and that the components of the materials were commonly known in the industry, undermines Chartwell's assertion of trade secret ownership. *See, e.g.*, *NEXT Payment Sols., Inc. v. CLEAResult Consulting, Inc.*, No. 1:17-CV-8829, 2020 WL 2836778, at *15 (N.D. Ill. May 31, 2020) (concluding that plaintiff's identification of its trade secrets was problematic because plaintiff "doesn't offer 'computer printouts, formulae, memoranda, or any other tangible technical data' *of its own*, identifying the trade secrets that [plaintiff] itself developed") (quoting *Lynchval Sys. Inc. v. Chi. Consulting Actuaries, Inc.*, No. 95 C 1490, 1998 WL 151814, at *6 (N.D. Ill. Mar. 27, 1998)).

Even if Chartwell (through Jan McCallum) was involved in selecting the specific paper, Chartwell fails to explain what components of its alleged trade secret are known or not known in the trade or how the combination of elements is unknown to the trade. *See REXA, Inc.*, 42 F.4th at 663 (explaining that plaintiff must isolate and identify the aspects of the alleged trade dress that are unknown to the trade); *U.S. Gypsum Co. v. LaFarge N. Am., Inc.*, 508 F. Supp. 2d 601, 623 (N.D. Ill. 2007) ("Information that is generally known or understood within an industry, even if not known to the public at large, does not qualify as a trade secret."); *NEXT Payment Sols., Inc.*, 2020 WL 2836778, at *10 (stating that a plaintiff must show the information is "not known to others who might profit by its use") (quotation omitted).

Chartwell's reliance on its exclusivity agreement with Mr. Coker to show trade secret ownership is unpersuasive. Chartwell does not demonstrate that the

exclusivity agreement contained any confidentiality provision. And it does not cite any authority that an exclusivity agreement (as opposed to a confidentiality agreement) supports a finding that certain information is a trade secret. *See Abrasic 90 Inc. v. Weldcote Metals, Inc.*, 364 F. Supp. 3d 888, 898 (N.D. Ill. 2019) ("Failure to enter into nondisclosure or confidentiality agreements often dooms trade secret claims.") (collecting cases).

Chartwell similarly fails to show that its financial data and pricing information constitute a trade secret. Chartwell argues that Neil McCallum testified that Chartwell pricing including Dollar Tree's margins are not public knowledge, and Team only knew this information because Mr. McCallum shared it with Mr. Cipriani "in trust and confidence." (Dkt. 101 at 7). However it is undisputed that Dollar Tree shared the prices it was paying for the wall decal product with suppliers, and Chartwell had no way to prevent Dollar Tree from sharing the prices that Chartwell charged for these products with competitors. DSOF ¶ 30. Further, Chartwell again fails to provide any evidence of a confidentiality agreement covering the pricing information. *See Arjo, Inc. v. Handicare USA, Inc.*, No. 18 C 2554, 2018 WL 5298527, at *4 (N.D. Ill. Oct. 25, 2018) (noting that pricing information shared without confidentiality requirements does not merit trade secret protection).

Therefore, Chartwell has not shown the existence of a trade secret. For this reason alone, Chartwell's trade secret claim fails.

### 2. *Misappropriation*

Even assuming Chartwell established that it had protectable trade secrets in the paper product or pricing information, Chartwell's trade secret claim also fails because it provides no evidence of misappropriation. Under ITSA, the trade secret must be either "acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use" or "derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use." 765 Ill. Comp. Stat. 1065/2(b). Chartwell does not dispute that Mark Meccia (who set the prices for TPP) never knew the unit price at which Chartwell was selling its wall decor products to Dollar Tree or any other customer and did not know of Chartwell's margins or costs for its wall decor products. DSOF ¶ 31. Nor did Cipriani or anyone at Team ever share with Meccia any pricing information with respect to any Chartwell wall decor products. *Id.*[12] Chartwell discusses how Defendants *used* the alleged trade secrets, but that is different from showing Defendants *misappropriated* trade secrets. *See REXA, Inc.*, 42 F.4th at 662; *see also Liebert Corp. v. Mazur*, 827 N.E.2d 909, 925 (Ill. App. Ct. 2005) (explaining that misappropriation can be shown through "improper acquisition, unauthorized disclosure, or unauthorized use.").

In sum, the Court grants summary judgment to Defendants on the ITSA claim.

---

[12] Despite admitting these facts (Dkt. 100 ¶ 31), Chartwell challenges Meccia's affidavit as "self-serving." (Dkt. 101 at 12). The Court will not disregard the affidavit on this basis. *See Hill v. Tangherlini*, 724 F.3d 965, 967 (7th Cir. 2013) (explaining that "the term 'self-serving' must not be used to denigrate perfectly admissible evidence through which a party tries to present its side of the story at summary judgment").

## IV.    Tortious Interference (Count V)

Chartwell claims that it had a long-standing business relationship with Dollar Tree and after Chartwell stopped doing business with Team and Defendants copied Chartwell's product, Defendants used these "knockoffs to pitch their products to Dollar Tree." (Dkt. 101 at 14–15). This interference, Chartwell argues, resulted in the "erosion of its sale price to Dollar Tree." *Id*. at 14.[13] A successful tortious interference claim requires proof of the following four elements: (1) a reasonable expectancy of entering into a valid business relationship; (2) the other party's knowledge of the expectancy; (3) the other party's intentional and unjustifiable interference that induced or caused a breach or termination of the expectancy; and (4) damage to the complaining party resulting from the other party's conduct. *F:A J Kikson v. Underwriters Labs., Inc.*, 492 F.3d 794, 800 (7th Cir. 2007). "Illinois courts have consistently held that the plaintiff must allege and prove facts which demonstrate that the defendants acted with the purpose of injuring the plaintiff's expectancies." *Id*. (quotation omitted).

Defendants argue that the competition privilege under Illinois law dooms Chartwell's tortious interference claim. In other words, they were not barred "from

---

[13] The Court will not disregard the section of Defendants' motion related to the tortious interference claim, as Chartwell requests, because Defendants did not cite their Local Rule 56.1 statement. Defendants assert the competition defense to this claim, arguing Chartwell lacks evidence of Defendants' malice or ill will. Chartwell concedes this privilege applies so it must provide evidence to overcome it. *See Rozumalski v. W.F. Baird & Assocs., Ltd.*, 937 F.3d 919, 925 (7th Cir. 2019) (party opposing a summary judgment motion must inform the court "of the reasons, legal or factual, why summary judgment should not be entered"); *see also Kreg Therapeutics, Inc. v. VitalGo, Inc.*, 919 F.3d 405, 414 (7th Cir. 2019) (district judges have discretion in applying Local Rule 56.1).

30

competing with Chartwell simply because Chartwell had a long-standing relationship with Dollar Tree." (Dkt. 85 at 16). In Illinois, "[c]ompetition is one of the numerous privileges that serve as a complete defense to a claim for tortious interference" and "is recognized so long as competitive conduct is not motivated solely by spite or ill will." *Hackman v. Dickerson Realtors, Inc.*, 746 F. Supp. 2d 962, 972 (N.D. Ill. 2010) (alteration in original) (quotation omitted). "Legitimate competitive efforts . . . are not tortious interferences with business." *Feldman v. Allegheny Int'l, Inc.*, 850 F.2d 1217, 1224 (7th Cir. 1988). The privilege means "that a market participant can act to advance its interests at the expense of its competitor." *Brinley Holdings Inc. v. RSH Aviation, Inc.*, 580 F. Supp. 3d 520, 557 (N.D. Ill. 2022) (cleaned up).

Defendants contend that Chartwell has no evidence of malice or that Defendants' did not, at least in part, act to advance their interests in competing with Chartwell. Chartwell agrees that the competitor's privilege applies. But it argues that Defendants used wrongful means or acted with malice, initially by concealing the Team–TPP relationship from Chartwell and targeting Chartwell by going after its Dollar Tree business. However as Defendants point out, Defendants' efforts must be directed at a third party, and these allegations concern conduct directed at Chartwell. *See George A. Fuller Co. v. Chicago Coll. of Osteopathic Med.*, 719 F.2d 1326, 1331 (7th Cir. 1983) (noting that acts must be "immediately directed at a third party"); *McCoy v. Iberdrola Renewables, Inc.*, 760 F.3d 674, 686 (7th Cir. 2014) (holding that a tortious interference with expectancy claim failed without allegedly improper conduct directed to the third party).

Chartwell also contends that there is evidence of wrongful means or malice in Defendants' use of the copied product to pitch their product to Dollar Tree and intentionally misleading Dollar Tree by boasting about their experience making "the same product". With regard to the alleged copying, Chartwell does not respond to Defendants' argument that their sale of products that look similar to Chartwell's products is not tortious. (Dkt. 85 at 15, arguing that federal law encourages copying to benefit consumers). It is not "this court's job to make arguments or marshal evidence for" Chartwell. *Nat'l Inspection & Repairs, Inc. v. George S. May Int'l Co.*, No. 03 C 5529, 2008 WL 4389834, at \*1 (N.D. Ill. Sept. 24, 2008), *aff'd*, 600 F.3d 878 (7th Cir. 2010).

As for misleading Dollar Tree, Chartwell does not argue that Defendants committed fraud and does not cite authority that suggests Defendants' conduct amounts to malice or ill will sufficient to overcome the competitor's privilege. Again the Court will not construct Chartwell's argument for it. *See Rozumalski*, 937 F.3d at 925 ("It is a well-settled rule that a party opposing a summary judgment motion must inform the trial judge of the reasons, legal or factual, why summary judgment should not be entered."). Even if certain statements by Defendants to Dollar Tree could be construed as misleading, commercial competitors are privileged to interfere with one another "provided their intent is, *at least in part*, to further their businesses and is not *solely* motivated by spite or ill will." *Imperial Apparel, Ltd. v. Cosmo's Designer Direct, Inc.*, 882 N.E.2d 1011, 1019 (Ill. 2008) (emphasis added). Chartwell does not

provide evidence that Defendants were motivated solely by spite in seeking to do business with Dollar Tree.

Thus Court grants summary judgment to Defendants on this claim.

## CONCLUSION

For the stated reasons, Defendants' motion to bar expert Mark Partridge [87] is denied in large part. Defendants' motion to bar expert David Duski [88] is denied in large part. Chartwell's motion to bar expert Sarah Butler [92] is denied. Defendants' motion for summary judgment [85, 86] is granted in part and denied in part. Plaintiff's motion for partial summary judgment [89, 91] is denied. The only claim remaining is Plaintiff's trade dress infringement claim.


E N T E R :


Dated: February 14, 2023

*Mary M Rowland*
_____
MARY M. ROWLAND
United States District Judge

33